**BANKS et al. v. CHAS. KURZ CO. et al.**

No. 225 of 1945.

District Court, E. D. Pennsylvania.

Nov. 18, 1946.

As Amended Nov. 29, 1946.

Howard M. Long and Howard T. Long, both of Philadelphia, Pa., for libellants.

Krusen, Evans and Shaw, by Rowland C. Evans, Jr., all of Philadelphia, Pa., for respondent.

KALODNER, Circuit Judge.

This is a libel for charter hire and damages arising out of the capsizing, in Philadelphia port waters, of two of the libellants' scows, the "Winchester" and the "B. & O.," while engaged in a service arranged for by the respondent, Chas. Kurz Co. The latter impleaded the Independent Pier Company, a stevedoring organization, but upon conclusion of the trial the action against it was dismissed for lack of evidence.

Three major issues on the merits are presented, first, the role of the respondent in its dealings with the libellants, that is whether agent or principal; second, the character of the hire agreement; assuming the determination of these issues in favor of the libellants, third, the liability of the respondent for the damage to the lighters. The latter issue involves questions of seaworthiness and negligence.

There are two preliminary questions raised by the respondent: One on a motion to strike certain matters from the libel, and the other by objection in the course of the trial to the introduction in evidence of two letters.

Respondent's motion to strike from the libel is predicated on Rule 12(f) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following Section 723c, and is directed at paragraphs six and thirteen of the libel, which declare that on January 5, 1945, the libellants, in two letters, demanded that the respondent fulfill its obligations under the alleged charter, raise the two scows, repair and redeliver them in the same good order and condition as when received. Copies of these letters were attached as exhibits. Because of additional material contained in the letters, the respondent, in its motion, seeks to have the two paragraphs of the libel and the letters expunged from the record on the ground that the letters are self-serving declarations and immaterial.

Of course, the Rules of Civil Procedure have no application in admiralty causes. Rule 81(a). Nevertheless, overlooking technical phraseology, the motion may be treated as stating an exception to the libel under Rule 35 of the Admiralty Rules, 28 U.S.C.A. following Section 723. See 2 Benedict on Admiralty, 6th Ed.1940, p. 56.

An examination of the record papers herein, however, discloses that the libel was filed on August 22, 1945; that service was accepted on September 10, 1945, and filed on September 12, 1945; and that the "motion to strike" was filed on October 1, 1945. Rule VII of the Local Rules in Admiralty of the Eastern District of Pennsylvania provides that "All exceptions to the pleadings shall be filed within

10 days after the service thereof unless, upon cause shown, the court shall otherwise order."· There being no court order to the contrary, respondent's motion, albeit considered as an exception under the Admiralty rules, is late and must be denied.

▪ In the course of trial, the libellants sought to introduce in evidence the two unanswered letters of January 5, 1945. The respondent objected on the ground that they were self-serving declarations. I am of the opinion that the objection is sound. Since the letters were also offered to prove a demand upon the respondent to raise and repair the scows, and such demand was, in any case, admitted, the letters may be considered as evidence for that purpose alone.

On the merits, the libellants contend that the respondent engaged the two scows under a bare boat charter or demise; therefore, it is sufficient to show delivery of the vessels in good condition and the failure to return them in like good condition, reasonable wear and tear excepted. The respondent asserts that it is not liable since it arranged for the scows as agent for a disclosed principal, and in any event, the charter agreement constituted a contract of affreightment. Further, respondent denies liability on the ground that the scows were unseaworthy at the time of delivery.

The charter involved herein was an oral agreement made by H. C. Bennett, manager of the Chas. Kurz Co., respondent, with Captain Charles T. Banks, a partner in the libellant company, on December 28, 1944. Evidence concerning the numerous subsequent telephone conversations between the two men, and related matters, will be considered when pertinent.

On the agency issue, Captain Banks testified that prior to the transaction here in controversy he never had business dealings with the Chas. Kurz Co.; that he did not know who "they were"; that when Bennett first called him on the telephone on December 28, 1944, he identified himself merely as the representative of Chas. Kurz Co.; that at no time during that or the later telephone conversations was he informed that the Chas. Kurz Co. were ships agents or agents for the War Shipping Administration. Banks further testified that Bennett

told him he had heard that Banks had scows available and that he wanted them for the purpose of removing slag ballast from the "S. S. Memnon," docked at Pier 98 South, bulkhead berth, but that he, Banks, did not know that the "S. S. Memnon" was a War Shipping Administration vessel, nor did he make inquiries concerning it.

One Harry Seegar, at the time assistant port operations manager for the War Shipping Administration, testified that on the morning of December 27th or 28th, he telephoned the Banks Towing Line, said he was from the War Shipping Administration, and inquired about lighters, and was informed that lighters were available. Seegar also testified that he then said the War Shipping Administration had no authority to order lighters, but that Chas. Kurz would call, but he did not state who Chas. Kurz was. However, Seegar did not know to whom he had spoken, and at the time of the trial could not say that he had talked to Captain Banks. Captain Banks could not recall having talked to Seegar, nor did he know who Seegar was.

Bennett testified that as a result of a conversation with Seegar, he telephoned the Banks Line at about 10:30 A.M. on December 28, 1944, and spoke to Captain Banks. He said he told Banks that he was from Chas. Kurz Co., agents for the War Shipping Administration, that he had talked to Seegar and was advised that Banks had lighters available.

▪ This comprises all of the evidence on this phase of the controversy. I fully credit the testimony of Captain Banks to the effect that Bennett identified himself only as representing the Chas. Kurz Co. Since Seegar could not say that he spoke to Captain Banks personally, or to one whose knowledge may be imputed to Banks, I conclude that Banks contracted with Bennett as agent for the Chas. Kurz Co. That Banks knew, or should have known, that the Kurz Co. was a ships' agent is immaterial, for its liability is the same here whether it contracted as a principal, or on behalf of an undisclosed principal—in either case, it is a party to the contract. Restatement, Agency, Sections 321 and 322;

Lewis v. United States Navigation Co., Inc., D.C.S.D.N.Y., 1944, 57 F.Supp. 652, 655; Dorsey v. Martin, D.C.E.D.Pa., 1945, 58 F.Supp. 722, 723.

The second issue raised by the respondent as affecting its liability relates to the nature of the charter. The arrangement was made over the telephone and, as may be expected, the parties offered contradictory evidence as to what was said.

According to Captain Banks, in the course of the telephone conversation with Bennett on the morning of December 28, 1944, Bennett told Banks he required lighters to remove slag ballast from the "S. S. Memnon." On being told that lighters were available, Bennett asked for their dimensions and capacity, and the hire charges per hour. Banks said that the rate was $15 per day for each boat without a man, or $25 per day with a man. Bennett asked what the difference was, and Banks replied that it was in the hire of the man. Banks also told Bennett that under his insurance agreement it was necessary to have a man on board. Bennett said he did not need men as he had plenty to care for the lighters. Banks was also to tow the lighters on Bennett's instructions, and it was agreed that Banks would have the "Winchester" alongside the "S. S. Memnon" for a 7 A.M. start the next morning.

Banks further testified that the term "bareboat charter" was not used, but because the lighters were to go without captains he understood that Bennett was taking the boats under such a charter, to return them in the same condition as received, reasonable wear and tear excepted.

According to Bennett, after Banks affirmed the fact that he had available lighters and that they were equipped to carry slag ballast, he inquired about the price. Banks quoted $15 per day. Bennett then said he would call back later to let him know whether he wanted the lighters. During this conversation also, Bennett told Banks he would need the lighters for about a week or ten days. The uncertainty was a result of the fact that Bennett did not know where he was going to put the slag ballast, but he did not wish to store it for any length of time.

After having a conversation with a Mr. Carr, Bennett called Banks again at about 2 P.M. on the same day. The purpose of the call, Bennett testified, was to find out whether men would be on the lighters. In response to Bennett's question, Banks said that he could not furnish men. Bennett then asked whether Banks thought it "O.K." to load the lighters without a man on board; Banks replied that they had been operating without men "up to now" and he did not see why that could not continue. During this conversation arrangements were made for banks to deliver the "Winchester" alongside the "S. S. Memnon" for a 7 A.M. start the next morning. Bennett said he would let Banks know later about the second lighter.

Bennett further testified that there was no mention of the term "bareboat charter," that he did not understand that he took the lighters under a bareboat charter, and that he took them "the same as I would take them from anyone else." He assumed Banks would care for his own property. Also, Banks was not to have any part in supervising the loading and unloading of the scows, but was to tow them on his, Bennett's, instructions.

Charles F. Carr, superintendent of stevedores for the Independent Pier Company, the impleaded respondent, testified that before starting to discharge ballast to the lighters, Bennett told him he had obtained two lighters from Banks. Carr knew that Banks at times sent lighters without captains aboard and he asked Bennett if he had captains aboard; Bennett said no, but he would have a man on board. Carr also stated that no man was aboard either lighter during the loading with slag ballast.

On December 29, 1944, Bennett ordered the second lighter, the "B. & O." ˋ

This evidence establishes the charter party. The question as to the legal effect thereof is one frequently raised is admiralty cases, particularly where the transaction is oral. Here is highlighted the "grand division" in charter parties: the demise, on the one hand, and the contract of affreightment, on the other. Robinson on Admiralty (1939) 594. The practical

66

difference is readily apparent: In the one instance, the shipowner turns over his vessel—lets it out—to the charterer; in the other, he agrees, in essence, to transport goods. The legal effect of a demise is to put the parties, as between themselves, in the position of bailor and bailee of the vessel; the legal effect of a contract of affreightment obviously is to put the parties in the position of shipper and carrier of goods. In final legal analysis, it is well-settled, whether the charter constitutes a demise depends upon whether the management and control of the vessel are in the hands of the charterer. United States v. Shea, 1894, 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403; Romano v. West India Fruit & S. S. Co., Inc. (The Sonia II), 5 Cir., 1945, 151 F.2d 727, 729.

■ The parties in the instant case have emphasized the arrangement with respect to bargees or barge captains, but who supplies the crew is not always determinative. Robinson on Admiralty (1939) 594. Thus, it is generally held that an oral charter of a vessel without motive power, accompanied by a bargee paid by the owner, amounts to a demise. The Daniel Burns, D.C.S.D.N.Y., 1892, 52 F. 159; Hastorf v. F. R. Long-W. G. Broadhurst Co., 2 Cir., 1917, 239 F. 852; Tomkins Cove Stone Co. v. Bleakley Transp. Co., Inc., 3 Cir., 40 F. 2d 249; Ira S. Bushey & Sons v. W. E. Hedger & Co., 2 Cir., 40 F.2d 417; Alpine Forwarding Co. v. Pennsylvania R., 2 Cir., 60 F.2d 734, certiorari denied 287 U.S. 647, 53 S.Ct. 93, 77 L.Ed. 559. Respondent's suggestion that courts tend to lean against a construction resulting in a demise, while it may be applicable in other situations, apparently does not obtain in this instance.

■ The tenor of the agreement, even accepting Bennett's version, is not, in my opinion, that of a contract of carriage. The libellants were not to receive goods to be transported, nor did they assume the duties of a carrier. On the contrary, the respondent hired both lighters in accordance with a common practice, for an indefinite time at a fixed rate per diem. As Bennett himself said, he "took the scows the same as I would take them from anyone else."

Having furnished the lighters to the respondent, the libellants relinquished control and possession; they had nothing further to do with regard thereto; they were not to have any part in the loading or unloading of the lighters. Thus, when Bennett chartered the lighters he did not know where he was going to put the slag ballast, but he knew he did not wish to store it for any length of time. The respondent obviously intended to use, and under the agreement could have used, the lighters for storage as well as for transportation of the slag ballast. Thus, when the "B. & O." was loaded, Bennett had not decided where the ballast was to be discharged, and directed Banks to move the lighter "somewhere," presumably to be left until he determined where the load was to be discharged.

Libellants did, however, agree to furnish towage when called upon, but this, in my estimation, was a separate contract of towage. Cf. New Orleans Coal & Bisso Towboat Co. v. The Texas Co., 5 Cir., 122 F.2d 141, distinguishing Sacramento Navigation Co. v. Salz, 9 Cir., 3 F.2d 759, reversed 273 U.S. 326, 47 S.Ct. 368, 71 L.Ed. 663. Respondent demonstrated its possession and control when, on at least one occasion, the "B. & O." was moved from the side of the "S. S. Memnon" to the head of the dock, and again when the "B. & O." was pumped out. It may be noted, parenthetically, that not only were there no bargees, but the pump aboard the "Winchester" was removed before delivery; the "B. & O." also had no pump aboard.

Taking these matters into consideration, I conclude that the respondent had possession and control of the lighters, and that the verbal agreement constituted a demise. The case at bar differs from Hansen v. Dupont DeNemours & Co., Inc., 2 Cir., 33 F.2d 94, certiorari denied 280 U.S. 589, 50 S.Ct. 37, 74 L.Ed. 638, particularly in that there a verbal contract for barges was superceded by a written charter party whose language, the court determined, was inconsistent with a demise. In that case, also, the owner chartered his barges and a tug for the voyage, and retained possession and control of both.

The lighters "Winchester" and "B. & O." having been demised, the respondent is in the position of bailee with respect to the libellants. While not an insurer,[1] it is nevertheless liable for negligence. The burden of proving negligence rests upon the libellants as bailors. However, it is held that the bailor makes out a prima facie case by showing delivery in good condition and damage during the charter period,[2] whence it devolves upon the bailee to go forward with the exculpatory evidence. Tomkins Cove Stone Co. v. Bleakley Transp. Co., Inc., supra; The Sundial, 2 Cir., 43 F.2d 700; Ira S. Bushey & Sons v. W. E. Hedger & Co., supra; O'Brien Bros. v. City of New York, 2 Cir., 1925, 9 F.2d 542; Magistrelli v. Canuso, D.C.E.D.Pa., 45 F.Supp. 539; Cox v. Banks, D.C.E.D.Pa., 1943, 50 F.Supp. 871. The bailee must either show how the damage occurred and that his negligence did not cause it, or however it happened his fault had no part in it. Murray Lighterage & Transp. Co. v. Pennsylvania R., 2 Cir., 130 F.2d 199; Alpine Forwarding Co. v. Pennsylvania R., supra.

The respondent here offered no evidence to explain the capsizing of the two lighters. However, it defended upon the ground that the lighters were unseaworthy at the time of delivery. If this were true, manifestly the respondent is not responsible in the absence of evidence of negligence. Robinson on Admiralty (1939) Section 84.

The evidence leaves no doubt concerning the seaworthiness of the "B. & O." That lighter was inspected before delivery and found water tight. It was delivered on December 29, 1944, and by December 31st it was loaded with 195 tons of slag ballast, when it was moved to the end of the dock. There it remained afloat until January 3, 1945. At some time on January 2nd it was pumped out by the Coast Guard; nevertheless, it capsized. A joint survey held subsequent to the raising of the "B. & O." disclosed damage on the port bow caused by external contact which broke the bumper log, the three uppermost bow end planks and started off additional adjacent bow planks at the post bow corner. The entire corner seam was opened from the deck down to below the water line. The surveyors agreed that this contact, probably with an unknown vessel, was the cause of the sinking, and that the "B. & O." was seaworthy prior to the accident. Accordingly, not having offered exonerating evidence, on the operation of the presumption of negligence, the respondent must be held liable for the damages to the lighter "B. & O."

The defense of unseaworthiness is, however, urged upon the court with respect to the lighter "Winchester." The issue is important since the libellants are entitled to the presumption of negligence of the respondent only in the event they prove delivery in a seaworthy condition. The Sundial, supra; Higman Co. v. The Harper #145, 2 Cir., 42 F.2d 161.

Ordinarily, where a boat sinks without external contact in calm weather and smooth water[3] a presumption of unseaworthiness arises. The Jungshoved, 2

---

[1] In the instant case, the evidence does not establish an express absolute agreement to return in good condition such as would make the respondent absolutely liable. See Sun Printing & Publishing Ass'n v. Moore, 1902, 183 U.S. 642, 22 S.Ct. 240, 46 L.Ed. 366. Such an agreement is not to be implied. Mulvaney v. King Paint Mfg. Co., 2 Cir., 1919, 256 F. 612; The Montezuma III (McAllister Lighterage Line v. Pennsylvania R. R. Co.) D.C., 66 F.Supp. 562. Nevertheless, the bailee is obligated to keep the subject of the bailment safe and to return it in good condition except for reasonable wear and tear, not as an insurer, but as an ordinarily prudent man. Mulvaney v. King Paint Mfg. Co., supra; Tomkins Cove Stone Co. v. Bleakley Transp. Co., supra; Alpine Forwarding Co. v. Pennsylvania R., supra; Schoonmaker-Conners Co. v. Lambert Trans. Co., 2 Cir., 1920, 268 F. 102; Cox v. Banks, supra.

[2] The rule is frequently stated as requiring a showing of delivery in good condition under a demise and redelivery in bad condition; Howard v. Dobbins-Trinity Coal Co., 2 Cir., 111 F.2d 571; New England Co. v. Rugo Construction Co., D.C. Mass., 60 F.Supp. 143; see discussion in Tomkins Cove Stone Co. v. Bleakley Transp. Co., supra.

[3] The weather report shows cloudy weather with light rain on December 28th, and snow totalling 0.7 inches during the nights of December 29th and 30th, 1944.

Cir., 290 F. 733; Higman Co. v. The Harper #145, supra. However, here the "Winchester" was damaged by external contact. The surveyor De Mars, whose testimony I find to be most explicit and credible, testified that after receiving damage by external contact such as the "Winchester" sustained, the vessel could not remain afloat without continuous pumping. The undisputed evidence is that from the time the "Winchester" was first moved from the libellants' pier, when it was dry, it had not been pumped out. Accordingly, the presumption of unseaworthiness is not effective in this instance.

On the issue of seaworthiness, the evidence is that the "Winchester" from September, 1944, to December 15, 1944, was engaged in trade carrying cargo without trouble and without requiring more than normal pumping. At the time of delivery to the respondent, its bilge was dry. Caulking was in good condition, and although the interior of the hull was said to be "soft" or decayed, the surveyors agreed that the lighter was not rendered unseaworthy thereby.

A joint survey held subsequent to the raising of the "Winchester" disclosed that the starboard bilge log was badly cut by a ship's propeller over an area of five feet approximately eighteen feet from the bow or forward end extending into the bottom edge of the log and into the bottom planks about six inches. Five bottom planks were damaged by propeller cuts, and two bottom planks were broken approximately twenty-four inches from the bow end. All the surveyors agreed that this was substantial damage which permitted water to enter the bilge. The cuts made the vessel unseaworthy. This survey included only such damage as contributed to the capsizing of the lighter.

One of the surveyors, Rhode, who rendered an additional report to his superiors upon request of the respondent, testified that he found a condition on the stern end of the vessel which he described as a wearing down to a "feather edge" of the knuckle plank and the first planks above and below the knuckle plank at the starboard corner and at the port corner where the fastening spike was also worn away. This condition he said was not of recent origin, but was a gradual wearing away which took some time to develop. Rhode believed that this condition rendered the "Winchester" unseaworthy, and although the propeller cuts admitted the greater volume of water, this condition did contribute to the capsizing.

The value of this testimony is diminished by the fact that this worn condition was not included in the joint survey, which, as even Rhode testified, was intended to include everything which contributed to and arose out of the sinking. On the other hand, the surveyor De Mars, whose testimony I fully credit, stated that the "Winchester" was in operating condition prior to the damage by the propeller cuts.

Captain Banks testified that following temporary repairs, the "Winchester" was put back into service from March to August, 1945, and had no trouble. The foreman of the shipyard which made the repairs testified that except for two bow planks, no repairs other than those called for in the joint survey were made. The survey discloses that the two bow planks were required to be removed to enable cleansing of the "Winchester" for the purpose of the survey. As before noted, the survey did not include the worn condition described by Rhode.

Finally, the tug captain who delivered the "B. & O." on December 29th, saw the "Winchester" light and in apparent good condition. According to Carr, loading of the "Winchester" began about 11 P.M. on December 29th, when he last saw it afloat. There is no testimony that it was not all right then. Significantly, the credible evidence is that the propeller cuts would have permitted water to enter the bilge even while light, and that they were sufficient to cause the vessel to career and capsize unless it was continuously pumped out. Nevertheless, when the "Winchester" was first moved from the libellants' pier on December 28th, it was, I find, dry. The vessel capsized on December 30th, never having been pumped out. The reasonable conclusion, therefore, is that the propeller damage must have been inflicted at some

time subsequent to the delivery of the "Winchester."

Taking these factors into consideration, it is my opinion that the libellants have satisfactorily shown that the "Winchester" was seaworthy on delivery and that the cause of the capsizing was the damage during the charter period. The respondent, accordingly, having failed to go forward with the evidence to explain the damage, or to show that, however it happened, it was not due to its fault, must remain liable therefor.

The respondent urges upon the court the argument that Captain Banks' acceptance of the responsibility of caring for the lighters when notified of their difficulties by Bennett, indicates that he recognized his duty to care for them. I accept Banks' testimony as credible, and need only state that Bennett's persistent refusal to do anything, and his denials of responsibility, left no other course open to Banks. See also, Kenny v. City of New York (The Columbiad) 2 Cir., 108 F.2d 958.

Of course, the fact that the libellants made only temporary repairs rather than the full repairs called for in the joint survey does not diminish the amount of the libellants' recovery. Pennsylvania R. v. Downer Towing Corp., 2 Cir., 11 F.2d 466. It is suggested that the estimated cost of repairs is unreasonable, but lacking evidence to the contrary and considering that three surveyors unanimously agreed upon the costs, I accept the joint survey as being reasonable and fair in its estimation.

Finally, it may be noted that respondent has not contested the inclusion as an item of damages the loss of hire by reason of the sinking and repairs. On this score see Cox v. Banks, supra.

Accordingly, I make the following

### Findings of Fact.

1. The respondent, Chas. Kurz Co., is a corporation organized and existing under the laws of the State of Delaware, having an office and place of business in Philadelphia, Penna.

2. The libellants, Charles T. Banks and Flo L. Banks, are partners trading as the Charles T. Banks Towing Line, and were at all times pertinent hereto, and still are, the owners of the lighter "B. & O." and the lighter "Winchester."

3. On December 28, 1944, the libellants, by Charles T. Banks, and the respondent, by H. C. Bennett, entered into an oral charter for the lighters "Winchester" and "B. & O." at the rate of $15 per day. The libellants also agreed to tow such lighters when and as directed by the respondent.

4. Charles T. Banks was not informed, nor did he know prior to the making of the contracts involved, that Chas. Kurz Co. was an agent for the War Shipping Administration.

5. The "Winchester" was delivered under said charter by libellants to the respondent on the evening of December 28, 1944, at Pier 98 South Wharves, and at the time of such delivery the "Winchester" was fit and seaworthy to receive and deliver the cargoes to be loaded thereon as required by the respondent.

6. The "B. & O." was delivered under said charter by the libellants on the evening of December 29, 1944, and at the time of said delivery the "B. & O." was fit and seaworthy to receive and deliver the cargoes to be loaded thereon as required by the respondent.

7. Under the said charters the respondent had custody, control and management of both lighters.

8. Subsequent to the delivery, the "Winchester" was damaged by the propeller of an unknown ship and on December 30, 1944, it capsized and sank with 90 tons of slag ballast aboard. The propeller cuts were of such nature as to cause water to enter the bilge even while light, and to cause careening and capsizing unless continuously pumped out.

9. Subsequent to delivery, on December 29, 1944, the "B. & O." was loaded with 195 tons of slag ballast. On December 31, 1944, it was moved by the respondent and left standing unattended until January 3, 1945, except when, on January 2, 1945, it was pumped out by the Coast Guard. It was badly damaged by external contact at some time during the interval of December

31, 1944, and January 3, 1945, when it sank as a result thereof.

10. The respondent having failed and refused to raise and repair the lighters, libellants procured the raising and made temporary repairs at their own expense.

11. The cost of raising the "Winchester" was $1,332.83, and the cost of raising the "B. & O." was $1,233.29.

12. The cost of the joint survey of the "Winchester" was $125 and of the "B. & O." $85.

\* \* \*

14. The libellants were required to render towage in the amount of $44 for the "Winchester" and $84 for the "B. & O.," or a total of $128.

15. The libellants were deprived of the services of the "Winchester" by reason of the sinking, from December 31, 1944, to March 15, 1945, at a rate of $15.00 per day, or a total of $1110.00.

15(a). The libellants were deprived of the services of the "B. & O." by reason of the sinking, from January 4, 1945, to March 19, 1945, at a rate of $15 per day, or a total of $1,110.

16. The respondents had use of the "Winchester" under the charter and prior to the sinking, for two days at the rate of $15 per day, or a total of $30; the "B. & O." for five days at the same rate, or a total of $75. Towage for the two lighters rendered by the libellants amounts to $44 for both.

17. The joint survey of the "Winchester," held on February 16, 1945, in which all the surveyors joined, and which included only such damage as caused, contributed to and resulted from the sinking of the "Winchester" estimated the cost of repairs therefor at $4,680.

18. The joint survey of the "B. & O.," held on March 1, 1945, in which all surveyors joined, estimated the cost of repairs thereto at $3,889.

And I state the following

## Conclusions of Law.

1. This court has jurisdiction over the parties and the subject matter.

2. The respondent obtained the lighters "Winchester" and "B. & O." from the libellants under an oral demise agreement.

3. The respondent was a party to the charter, having acted as principal or as agent for an undisclosed principal.

4. Both lighters having been delivered in good condition and having been damaged during the charter period while in the possession and control of the respondent, respondent was obliged to go forward with evidence to show that its fault had no part in the accidents here in controversy.

5. The respondent failed to offer exculpatory evidence to overcome the presumption of negligence, and is therefore liable for the damages sustained by the libellants by reason of the capsizing and the sinking of the lighters "Winchester" and "B. & O.," in the total amount of $13,693.12.

6. The respondent is also liable for charter hire and towage prior to the sinking of the "Winchester" in the amount of $52, and of the "B. & O." in the amount of $97 or a total of $149.

7. Libellants are entitled to a judgment in the total amount of $13,842.12 plus interest properly computed on each item.

An order may be entered in accordance herewith.