**SOUTHWESTERN SUGAR AND MO-LASSES COMPANY, Inc.,**

v.

**RIVER TERMINALS CORPORATION.**

No. 979.

United States District Court
E. D. Louisiana,
New Orleans Division.

July 12, 1957.

P. M. Flanagan and Amos L. Ponder, Jr., New Orleans, La., George L. Varian, New York City, for libellant.

Lemle & Kelleher, and Selim B. Lemle, New Orleans, La., for respondent.

CHRISTENBERRY, Chief Judge.

The Court, having heard the evidence and the arguments of proctors, and having taken time to consider the matter, hereby makes the following findings of fact and conclusions of law:

Findings of Fact.

I.

At all material times, libellant Southwestern Sugar and Molasses Company, Incorporated (hereinafter called Southwestern), was a corporation existing under the laws of Texas, with its principal office and place of business at Texas City, Texas, and engaged in the business of selling blackstrap molasses products.

II.

At all material times, respondent River Terminals Corporation (hereinafter called River) was a corporation existing under the laws of Delaware, with offices at Houston, Texas, and at Harvey and New Orleans, Louisiana, and engaged in operating tow boats.

III.

At all material times, International Transportation Corporation (hereinafter called International) was a corporation existing under the laws of New York, with an office at Texas City, Texas.

IV.

At all material times, International was the owner of the steel tank barge

Peter B, which was during September, 1944, bareboat chartered for an indefinite period of time to Southwestern. The charter party agreement provided that Southwestern would operate the Peter B and maintain and repair the barge, and return her to International at the termination of the charter in the same good order and condition as when delivered, ordinary wear and tear excepted.

## V.

The dumb barge Peter B was a steel tank barge of 175 feet in length, 26 feet 4 inches in breadth, and 11 feet in depth. She was fitted with 3 cylindrical tanks on her center line and 8 rectangular tanks, four on each side, each separated by water-tight bulkheads. The rectangular tanks were numbered from bow to stern on the port side: 1, 3, 5 and 7; and from bow to stern on the starboard side: 2, 4, 6 and 8. She was also fitted with forward and aft dry rakes, and there was a gasoline powered pump in the aft rake, used for pumping cargo. The barge was being operated by Southwestern for the carriage of molasses in tow between Reserve, Louisiana, and Texas City, the barge having completed approximately thirteen (13) trips in all between said ports via the Intracoastal Waterway in tow of River's tugs during the charter period.

## VI.

On September 16, 1944, a Saturday, the Peter B arrived at Reserve, Louisiana, and was tendered at the Godchaux Sugar Refinery for the loading of molasses. Prior to loading, the cargo tanks were inspected and found tight and dry, and the barge was in apparent good condition.

## VII.

Loading was commenced on the same day under the supervision of Mr. L. H. Frieler, Southwestern's Texas City manager. The cargo tanks were loaded from aft to forward and after about 10 inches of cargo had been loaded into Number 2 tank, a noise was heard from this tank.

## VIII.

Loading was immediately stopped and investigation revealed that a crack existed in the starboard shell plate approximately 6 to 8 inches in length and located about 80½ inches from the top of Number 2 cargo tank. No cargo was thereafter placed in either Numbers 1 or 2 cargo tanks. Because these tanks were substantially empty, her freeboard was somewhat greater than her normal freeboard of 3 feet 2 inches forward and 2 feet 6 inches aft.

## IX.

Prior to the loading, it had been orally agreed between Southwestern and River that River would pick up the barge Peter B when loaded and tow it to Harvey for integration in a tow of several barges which would be towed through the Intracoastal Waterway to Texas City, the usual practice carried out by River with respect to previous trips of the Peter B. This movement, according to the bill of lading issued by River on September 17, 1944, was subject to River's tariff on file with the Interstate Commerce Commission, which tariff contained the following provision:

> "When shipments are transported in barges furnished by owner, shippers, consignees or parties other than the carrier, such barges and (or) cargoes will be handled at owner's risk only, whether the loss or damage is caused by negligence or otherwise."

## X.

Upon termination of the loading the evening of September 16, 1944, Frieler attempted to notify River by telephone at its Harvey and New Orleans offices about the condition of cargo tanks Numbers 1 and 2, but he was unsuccessful. The following morning he again attempted to contact River at these offices, but to no avail, and he found the barge Peter B had already been towed from its loading berth by River's tug.

## XI.

Frieler proceeded to Houston and on the following morning, Monday, confer-

red with a Mr. Hinkle, River's General Agent there. He advised Hinkle about the condition of the barge and requested that this information be reported immediately to the master of the towing tug, so that the Peter B could be carefully observed, and that he, Frieler, be periodically advised about the movement of the barge. Hinkle agreed to this, and informed Frieler that the integrated tow would not depart Harvey until the following morning, and, in any event, that the tugs were equipped to pump the barge as might be required.

## XII.

River's Houston office failed to transmit such information to the tug master, and failed to notify Frieler of the movement of the Peter B.

## XIII.

Frieler went to Texas City and upon arrival spoke by telephone with a Captain R. L. Wynne, a surveyor for Southwestern's cargo insurer, in Houston. He informed Wynne about the condition of the barge and it was agreed at Wynne's suggestion that the barge would not be unloaded until a survey was made on September 25, 1944, the following Monday, and the expected arrival date of the barge. On Thursday, Frieler telephoned Hinkle in Houston, and inquired about the position of the barge, but Hinkle had received no advices. Hinkle confirmed, however, that the expected arrival date was the weekend of September 23, 24, 1944. Frieler advised Hinkle that he would be out of town during that period and that no one would be present at Southwestern's terminal who was familiar with equipment and that he would cancel his trip if there was any difficulty expected. Hinkle advised him that none was expected. Frieler then spoke with Wynne, the surveyor, who indicated that he still wished to be present before the cargo was discharged. Frieler then left Texas City and remained out of that city until Monday, September 25, 1944.

## XIV.

Meanwhile, the Peter B had been individually towed from Reserve to Harvey by the tug John M. The barge was there integrated with three other barges and proceeded in tow by River's tug Sambo for Port Arthur, through the Intracoastal Waterway. At the time the tow passed the Harvey Locks, the barge Peter B maintained her trim, but started losing it thereafter, and at the Vermillion Locks her mean draft had increased 2 feet. Upon arrival at Port Arthur she was badly out of trim, her forward starboard corner having a freeboard of not more than 9 inches, and her aft freeboard having substantially the same draft as when she left Reserve, namely, something in excess of 2 feet, 3 inches. At Port Arthur, Texas, the Peter B was broken out of the tow and pushed individually, stern first, by River's tug Dottie Dee, to Texas City. During this last leg of the voyage, when it was apparent that the Number 2 tank was full of water, no inspection was made of this tank or the rake tanks, and the barge was pushed stern first across Galveston Bay at an average speed of 7 miles per hour.

## XV.

The Dottie Dee and her barge arrived at Pier O, Texas City, about midnight on Friday, September 22, 1944, and the barge was berthed across the tee of the pier. Later during the night the Dottie Dee returned and pushed the barge into the slipway, stern first, so that the deck of the forward end, which was then at the water's level, was exposed to the wash of vessels proceeding in the channel. No inspection of the barge was made then, nor was any notification of the arrival given to Southwestern at that time. Approximately 2,000 feet distant from and opposite Pier O, Snake Island in Galveston Bay provides a flat or shoal where the Peter B could have been beached without risk of damage or sinking.

## XVI.

The next morning, Saturday, September 23, 1944, a handyman of Southwestern found the barge, at which time the forward starboard corner was at the water level and waves were washing over the deck. A clerical employee of South-

western telephoned River's Houston office, notified them of the condition of the barge, and requested that a tug be sent to pump the barge or otherwise care for it. This employee was informed that there was nothing to be concerned about, and that the barge was not in danger of sinking. Wynne, the surveyor, was also notified, but he concurred in the opinion of River's Houston representative that there was no danger of the barge sinking, and stated that he would be down to Texas City to survey it Monday morning, as he had previously agreed.

### XVII.

The following morning, Sunday, September 24, 1944, the barge was found sunk by the head in about 30 feet of water, with the aft rake tank above water.

### XVIII.

Numerous unsuccessful attempts to raise the forward end of the barge were made after the arrival of Wynne on Sunday afternoon, and subsequently the Peter B was raised, drydocked and repaired.

### XIX.

At all times, Southwestern was the owner of the molasses loaded aboard the Peter B.

### Conclusions of Law.

#### I.

The action is within the Admiralty jurisdiction of this Court.

#### II.

■ The services furnished to Southwestern by River were those of towage and not carriage or afreightment. Mississippi Valley Barge Line Co. v. T. L. James & Co., 5 Cir., 1957, 244 F.2d 263.

#### III.

■ Consequently the release from liability for negligence contained in River's tariff referred to in its bill of lading covering this movement was invalid. Bisso v. Inland Waterways Corp., 1955, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911.

#### IV.

■ However, the tug is not liable as an insurer or as a common carrier.

It owes a duty to its tow to exercise such reasonable care and maritime skill as prudent navigators use in the performance of similar services. Any conduct alleged to have fallen below this standard must be affirmatively shown, and the burden of proving this type of negligence rests upon those who seek to establish liability therefor. Stall & McDermott v. The Southern Cross, 5 Cir., 1951, 196 F. 2d 309.

#### V.

■ This duty to exercise such reasonable care and maritime skill as prudent navigators employ in the performance of similar services, is not lessened by the fact that the vessel was unseaworthy at the beginning of the voyage, as was the situation in this case, when the tower is placed on notice of this unseaworthy condition. The tug's duty is to exercise reasonable care to safeguard its tow. Henry Dubois Sons Co. v. Pennsylvania R. Co., 2 Cir., 1931, 47 F.2d 172; and McCormick v. Jarrett, D.C. E.D.Mo.1899, 37 F. 380.

#### VI.

■ The loss and damage to the cargo and barge was the proximate result of negligence on the part of River and its towing tugs, in that, with specific knowledge of a crack in the way of Number 2 cargo tank prior to departure of the barge from Harvey:

(a) It failed to sound and pump the barge Peter B when her loss of freeboard forward made it apparent that the Peter B was taking water in either the forward rake tank or the Number 2 cargo tank, or both;

(b) it failed to stand by and sound and pump the 'Peter B at any time after arrival of the barge at Texas City when it was, or should have been, evident that said barge was taking water in the forward rake tank or the Number 2 cargo tank, or both, and was in danger of sinking;

(c) it moored the Peter B in danger of sinking with the forward starboard corner, which was at the water level, exposed to the wind and waves, and the

wash of vessels passing across the end of the slipway;

(d) it moored the Peter B in a deep water slipway, in an exposed and sinking condition, when the barge could and should have been moored in shallow water or beached on a flat, such as Snake Island, a short distance away; and

(e) it assured a clerical employee of Southwestern, who River knew was unfamiliar with marine equipment, that the Peter B was in safe condition on Saturday, September 23, when it knew, or should have known, that the barge was in danger of sinking and knew that there was no person available at Southwestern, capable of exercising any judgment as to the actual condition of such barge.

### VII.

Southwestern, as the bareboat charterer of the barge Peter B and owner of the molasses loaded therein, is entitled to recover on its own behalf and as bailee of the barge for the damage sustained by the barge and for the loss of the molasses cargo.

An interlocutory decree has been entered accordingly.