**GULF WAVE TOWING COMPANY, Inc.,**
Libellant,

v.

**V. J. MITCHELL, Respondent,**
Antoine Cheramie, Ramsey Cheramie, Harding Cheramie, in Personam, and **THE Motor Tug CARLTON in Rem,** Respondents Impleaded.

**CLARKE EQUIPMENT CORPORATION,**
Libellant,

v.

**THE Tug CARLTON,** her engines, etc., and Antoine Cheramie and Harding Cheramie d/b/a Roland Towing Company, Respondents,
**V. J. Mitchell, Respondent Impleaded.**

**CLARKE EQUIPMENT CORPORATION,**
Libellant,

v.

**GULF WAVE TOWING COMPANY, Inc.,**
and V. J. Mitchell, Respondents.

Nos. 3542, 3733, 3935.

United States District Court
E. D. Louisiana,
New Orleans Division.

Sept. 8, 1959.

Charles E. Richards, New Orleans, La., for Gulf Wave Towing Co., Inc., Libellant in Admiralty 3542 and Respondent in Admiralty 3935.

James J. Morrison, Wilder K. Kuhn, New Orleans, La., for V. J. Mitchell, Respondent in Admiralty 3542, Respondent Impleaded in Admiralty 3733, and Respondent in Admiralty 3935.

Lemle & Kelleher, Charles E. Lugenbuhl, Thomas H. Leach, New Orleans, La., for Antoine Cheramie, Ramsey Cheramie, Harding Cheramie and the Motor Tug Carlton, Respondents Impleaded in Admiralty 3542 and Respondents in Admiralty 3733.

J. SKELLY WRIGHT, District Judge.

These three libels, consolidated for trial, all arise out of the sinking and subsequent loss of the Barge W–123 in the Mississippi River near Happy Jack, Louisiana, on October 10, 1957. The first proceeding was brought by Gulf Wave Towing Company, Inc., as a broker, for various towing services performed for V. J. Mitchell, a contractor, at whose landing the barge sank. Mitchell, in this proceeding, filed a cross-libel against Gulf Wave for the loss of a cargo of riprap owned by him aboard the barge when it sank. Gulf Wave impleaded the M/V Carlton and her owners, Antoine Cheramie and Harding Cheramie, as the towing vessel which had transported the Barge W–123 from Kenner, Louisiana, to Happy Jack. The second libel was brought by Clarke Equipment Corporation, the owner of the W–123, against the Tug Carlton and Antoine and Harding Cheramie in which proceeding Mitchell was impleaded. The third libel was brought on behalf of Clarke Equipment Corporation against V. J. Mitchell, individually. The case was tried before this Court on the question of liability and, after considering the evidence, the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

1. Gulf Wave Towing Company, Inc., hereinafter referred to as Gulf Wave, was and now is a corporation organized and existing under the laws of the State of Louisiana, engaged in the brokerage of tugs and barges. Gulf Wave acted as the broker for V. J. Mitchell, supplying tugs and barges when requested by Mitchell. Gulf Wave neither owned nor operated any of the equipment furnished. It secured orders for the use of tugs and barges, engaged the required tugs or barges, and received a commission from the owners for the brokerage.

2. Clarke Equipment Corporation is a corporation organized and existing under the laws of the State of Louisiana and was the owner of the Barge W–123. The W–123, a steel cargo barge measuring 150′ x 35′, had a flat deck, without any retaining hopper, and was capable of carrying a cargo of approximately 300 tons.

3. V. J. Mitchell is a person of full age. Mitchell was, at the time pertinent here, a general contractor engaged in the building of a concrete revetment for the levee on the West Bank of the Mississippi River at Happy Jack, Louisiana. In order to build the revetment or dike, it was necessary for Mitchell to haul riprap, a term designating broken pieces of concrete or stone, from his landing at Kenner, Louisiana, downriver to the job site at Happy Jack, a distance of approximately 73 miles. The Tug Pamela Ann, owned by Mitchell, would assist in the movement of any barges necessary to transport this riprap. In addition, Mitchell owned a spud barge on which was located a crane utilized in both loading and unloading the riprap.

4. Antoine and Harding Cheramie are persons of full age, doing business as Roland Towing Company. On October 10, 1957, Antoine Cheramie and Harding Cheramie were the owners of the M/V Carlton, a documented vessel with registered dimensions: length, 41.2′, breadth, 18.0′, and depth, 6.7′. The Carlton was powered by two 300-horsepower Diesel engines and was at all times involved herein tight, staunch, strong and in all respects seaworthy. On the voyage in question, she was captained by Antoine Cheramie. Harding Cheramie served as deck hand.

5. Sometime prior to October 7, 1957, Mitchell engaged the services of five cargo barges through Gulf Wave Towing Company, Inc., one of which was the W–123. All of the barges were owned by Clarke Equipment Corporation and Mitchell agreed to pay $20 per day charter hire for each day the barges were in use. Although Mitchell denied it, the evidence is clear that Mitchell knew Gulf Wave Towing Company was acting as the agent for the owner.

6. On October 7, 1957, Gulf Wave, using one of its tugs, transported the five barges, including W–123, to Mitchell's Landing in Kenner, Louisiana. The barges arrived at Mitchell's Landing in Kenner, Louisiana, sometime during the day of October 7, 1957, and were inspected there by an employee of Clarke Equipment Corporation. Except for two missing hatch covers which were replaced, the barges were found to be watertight, having less than two inches of water in the bilges. The general manager of Clarke Equipment Corporation also made a visit to the landing where he spoke with Mitchell about the barges.

7. Mitchell's brother, who was not produced at the trial, was in charge of the loading of W–123 and the other barges. In spite of a 300-ton capacity, the W–123 was loaded with 340 tons of riprap. When loaded, the W–123 listed slightly. Mitchell admitted that he personally checked W–123 and determined that it and two other barges, though rusted, looked seaworthy. He testified that he rejected the remaining two barges as unfit for loading. There is no evidence to substantiate his claim that the two barges were rejected and it appears that he retained these two until October 17.

8. After the barges were loaded, Mitchell asked Gulf Wave to supply a tug to assist three barges and his spud barge downriver to the construction site at Happy Jack. Gulf Wave furnished the Tug Carlton. The Carlton arrived at Kenner, Louisiana, at approximately 8:00 P. M., October 9, 1957. The tug found Barge W–123 hard aground in Mitchell's slip. An inspection of the barge by both Harding Cheramie and Antoine Cheramie revealed substantial quantities of water in her compartments. Harding Cheramie inquired of Barras, Mitchell's foreman, whether the barge was to be taken into the tow. Barras, according to the Cheramies, called Mitchell and received instructions to pump the barge and see if it could make the trip.

Barras testified that he tried to call Mitchell but was unsuccessful. Nevertheless, he instructed the Cheramies to take the barge. In a prior sworn statement given by Barras to the U. S. Coast Guard shortly after the incident, Barras denied any knowledge that W–123 was aground or needed pumping before the voyage began.

9. Harding and Antoine Cheramie, using two 1½″ pumps, one from the Carlton and one from the Pamela Ann, proceeded to pump the barge dry and pull it off the ground. The pumps were kept aboard for further use during the trip. Harding Cheramie then made a personal inspection of the barge and found a small hole in the lead rake compartment and one crack in the watertight bulkhead separating the rake from the side compartment. The crack in the watertight bulkhead was approximately 16 or 18 inches from the bottom of the barge. As long as the water in the rake was kept below that level, the side compartment would remain dry without pumping.

10. The tow was made up in two tiers with the W–123 as the port lead barge. The holed rake end of the W–123 was faced up to Mitchell's spud barge which in turn was faced up to Mitchell's tug, Pamela Ann, with Mitchell's foreman, Barras, at the wheel. The starboard string was made up of two barges in tandem faced up to the Carlton, which tug controlled the navigation of the entire tow.

11. Barras, Mitchell's foreman, attempts to condemn the Tug Carlton for its navigation downriver and has testified that on several occasions, the Carlton had difficulty passing other vessels. This, however, is not supported by the credible testimony in the case. Harding and Antoine Cheramie, both veterans of many years on the Mississippi River, testified that the trip downriver was routine. Barras's deck hand, Hairford, made no mention whatever of any difficulty. Both Harding Cheramie and

Hairford did testify that they spent a greater portion of the night on the barge tending the pumps, and that at no time did it appear to be in any danger of sinking. In fact, once pumped dry, one pump working part time was sufficient to control the intake of water. Moreover, there was a large 3-inch pump aboard the spud barge which was never used.

12. The flotilla arrived at Happy Jack the morning of October 10. The Carlton, on instructions from Barras, tied the three loaded riprap barges on the West Bank of the river and then proceeded to push the spud barge to a point downriver approximately 500 feet where it was spudded in a location picked by Barras. Thereafter, the Carlton was discharged by Barras as its tow was completed. The Carlton took its pump off the W–123, leaving Mitchell's 1½-inch pump in position, but not operating, on the barge. Although there was approximately 1½ feet of water in the rake compartment at the time, the barge was apparently in no difficulty, being on the same keel as it had been during the entire voyage. Barras discharged the tug even though she had been chartered on an hourly basis and was available for any further employment necessary.

13. After the Carlton departed Happy Jack, the events concerning W–123 are in considerable doubt. The barge unquestionably sank, but when, where or how is not clear. Barras, who had taken charge of the flotilla after discharging the Carlton, testified that almost immediately he noticed that the barge was in trouble, necessitating his starting the 1½-inch pump remaining aboard and also utilizing the larger 3-inch pump from the spud barge which he testified [1] he moved alongside the stricken barge with the Pamela Ann. The pumps, according to Barras, were not able to control the influx of water into the barge, so Barras, in order to save the pumps, took them off the sinking barge. The barge did not sink immediately, however, because when

1. It is more reasonable to believe that he moved the W–123 downriver to the spud barge which was already spudded in location for unloading the barges.

Mitchell arrived on the scene sometime later, Mitchell, using the crane on the spud barge, tried to unload some of the riprap from the W–123. This failed as one end of the barge submerged. Mitchell then held the submerged end up with the crane and proceeded across the river to beach the barge. After beaching, a ⅝-inch line was run from the barge to a willow tree on the east bank to hold the barge on the strand. Mitchell and Barras then abandoned the barge. Several hours later Barras noticed it had sunk.

14. Barras's testimony differs from that of Mitchell and Hairford, his deck hand, in several important particulars. Hairford testified that the 3-inch pump was never placed aboard the W–123. Mitchell testified that no pumps were operating aboard the barge when he arrived. And he admitted that, once the W–123 was delivered to Happy Jack, it was then under the care and custody of his employees.

15. It is apparent that the W–123 sank because, after the arrival at Happy Jack, no effort was made to control the water it was making through the hole in its rake. The testimony of Barras indicating that he made such an effort is discredited and rejected. Since the barge was in Mitchell's custody during this period, Mitchell must bear the responsibility for the loss.

16. While there is no direct evidence showing that the W–123 was holed and cracked at Mitchell's Landing near Kenner, the evidence does show that the barge was not making water before it was overloaded, that it sank at the Landing where riprap was customarily loaded, giving rise to the possibility that it may have been holed by a piece of riprap on the bottom, and that the barge in its overloaded condition had to be washed off the bottom. Consequently, it is reasonable to conclude that the vessel received its wounds while in Mitchell's custody.

## Conclusions of Law

1. The Court has jurisdiction of these actions in Admiralty, and venue is properly laid in the Eastern District of Louisiana, New Orleans Division.

2. The tug is not liable as an insurer or as a common carrier. It owes a duty to its tow to exercise such reasonable care and maritime skill as prudent navigators use in the performance of similar services. Any conduct alleged to have fallen below this standard must be affirmatively shown, and the burden of proving this type of negligence rests upon those who seek to establish liability therefor. Stall & McDermott v. The Southern Cross, 5 Cir., 196 F.2d 309; Southwestern Sugar & Molasses Co. v. River Terminals Corp., D.C., 153 F.Supp. 923, 1957 A.M.C. 2218.

3. The duty to exercise reasonable care and maritime skill is not lessened by the fact that the vessel was unseaworthy at the beginning of the voyage as was the situation in this case. When the tower is placed on notice of this unseaworthy condition, the tug's duty is to exercise reasonable care to safeguard the tow until the towing service is performed or performance is excused. Henry Du Bois & Sons Co. v. Pennsylvania R. Co., 2 Cir., 47 F.2d 172, 1931 A.M.C. 312; Southwestern Sugar & Molasses Co. v. River Terminals Corp., supra.

4. Credible evidence in this case confirms that the Carlton and her crew exercised that degree of reasonable skill and care demanded of them and that the sinking of the W–123 was occasioned through no fault or negligence on the part of that vessel. The Carlton pumped the barge and made it ready for towage although it was admittedly holed and making water. The tug also successfully navigated the tow down a 73-mile stretch of the Mississippi River over a period of eleven hours without difficulty. When the tug and her crew were discharged by the charterer of the barge, the barge was left properly moored in no apparent difficulty with sufficient pumps available to keep her afloat. Mitchell and Clarke Equipment Company, the two parties claiming a lack of skill and care on the part of the tug, have failed to carry their

burden of proof. The proof affirmatively shows that the Carlton was free from fault. Thus any presumption which may arise against her as custodian of a dumb barge has been met and overborne.

5. Delivery of a barge in good order and redelivery thereof in a damaged condition, or failure to redeliver because of loss by sinking, raises a presumption of fault against the bailee. Howard v. Dobbins-Trinity Coal Co., 2 Cir., 111 F.2d 571, 1940 A.M.C. 800, certiorari denied Fuel Credit Corp. v. Howard, 311 U.S. 691, 61 S.Ct. 73, 85 L.Ed. 447; Tomkins Cove Stone Co. v. Bleakley Transp. Co., 3 Cir., 40 F.2d 249, 1930 A.M.C. 965; Banks v. Chas. Kurz Co., D.C., 69 F.Supp. 61, 1946 A.M.C. 1676; Cox v. Banks, D.C., 50 F.Supp. 871, 1943 A.M.C. 1002.

6. With respect to the claim of the Clarke Equipment Company, the owner of the barge, Mitchell had care, custody and control of the W–123 as bareboat charterer and bailee thereof. As bailee, Mitchell has the burden of showing either how the injury happened, and that his negligence did not cause it; or that, however it happened, his fault had no part in it. Edward G. Murray Lighterage & Transp. Co. v. Pennsylvania R. R., 2 Cir., 130 F.2d 199, 1942 A.M.C. 1055; Alpine Forwarding Co. v. Pennsylvania R. Co., 2 Cir., 60 F.2d 734, 1932 A.M.C. 1504, and cases therein cited.

7. Barge W–123 was delivered to Mitchell in good condition and the presumption of negligence arising against him by virtue of the loss of the vessel is unrebutted. Moreover, the evidence shows that his negligence in the following particulars was the proximate cause of the loss:

a. The barge was overloaded and out of trim.

b. In its overloaded condition, Mitchell, or those for whom he is responsible, caused the barge to be grounded in his loading slip. The grounding and the refloating of the barge probably account for the hole in the rake and the crack in the bulkhead.

c. The overloaded condition of the barge brought the holed area of the rake compartment dangerously close to the water line. See F. E. Grauwiller Transp. Co. v. Exner Sand & Gravel Corp., 2 Cir., 162 F.2d 90, 1947 A.M.C. 882.

d. The W–123 required pumping after delivery at Happy Jack, but neither the pump aboard nor Mitchell's large three to four-inch auxiliary pump from the spud barge was utilized. See Henry Du Bois & Sons Co. v. Pennsylvania R. Co., supra.

e. Mitchell abandoned the W–123 in a sinking condition off the bank of the river, secured only with a single ⅝-inch wire attached to a willow tree. Henry Du Bois & Sons Co. v. Pennsylvania R. Co., supra; Southwestern Sugar & Molasses Co. v. River Terminals Corp., supra, D.C., 153 F.Supp. 923, reversed on other grounds 5 Cir., 253 F.2d 922.

8. Mitchell is liable for the charter hire of the barges and the Carlton as well as for the loss of the W–123. Mitchell's claim for the loss of riprap in the W–123 must be denied.