## THE MONTEZUMA III.

### McALLISTER LIGHTERAGE LINE, INC., v. PENNSYLVANIA R. R. CO. et al.

#### No. 17260.

District Court, E. D. New York.

March 25, 1946.

Gerard M. McAllister, of New York City, for libellant.

Burlingham, Veeder, Clark & Hupper, of New York City (William S. Stuhr, Jr., of New York City, of counsel), for respondent.

Gerald E. Dwyer, of New York City (William R. Stevens and James L. More, both of New York City, of counsel), for respondent-impleaded.

INCH, District Judge.

This is a suit by libellant, McAllister Lighterage Line, Inc., which orally, on August 5, 1943, sub-chartered the barge Montezuma III to the Pennsylvania Railroad Company for an indefinite period at an agreed per diem rate.

At the time of the delivery of said barge to the Pennsylvania Railroad Company she was in good condition, in every respect seaworthy. Libellant's bargee went with the barge. On March 2, 1944, the barge was returned to libellant by the Pennsylvania Railroad Company in a damaged condition.

Libellant brought this suit against the Pennsylvania Railroad Company based on the above demise.

For convenience I shall hereafter refer to this barge, as the Montezuma, to the Pennsylvania Railroad Company, as the Pennsylvania, to the impleaded New York Central Railroad Company and its tug New York Central 30, as the Central, and the barge Lehigh 36, as the Lehigh.

The Lehigh and Central have been brought into the picture by the required explanation of the Pennsylvania which impleaded the New York Central Railroad Company.

Because of the adequate explanation the suit becomes one for alleged negligence, the burden of proving which, by a fair preponderance of evidence, rests upon

libellant. Alpine Forwarding Co. v. Pennsylvania R. Co., 2 Cir., 60 F.2d 734.

The Pennsylvania asserts that the New York Central Railroad Company, owner of the tug Central 30, and her crew caused the damage suffered by the Montezuma. The defense of the Central appears to be one of complete innocence on the theory that whatever happened to the Montezuma was caused by persons unknown, under circumstances which are quite mysterious.

A brief reference to the facts in this interesting controversy will now be made, but unfortunately they lack any mysterious quality.

There is a small slip between Piers 18 and 19, Brooklyn, according to the record 106 feet wide in 1922. There is no evidence that it has been widened. On March 1, 1944, about three o'clock in the afternoon, a McAllister tug brought the Montezuma into this slip and securely tied her up to the inside of Pier 18. The tug then departed. The barge was light. Burgquist, the bargee, then reported to the Pennsylvania dispatcher, in accordance with his duty, where he was and that the boat was light.

Burquist says, and it is not disputed, that about five o'clock some longshoremen came and told him there was a ship coming in and that the barge would have to be shifted. That thereupon he and they pulled the Montezuma around the slip and hung her up alongside the starboard side of the barge Lehigh 36 which was on the opposite side of Pier 19. No lines were run out to the dock from the Montezuma, but two new lines were properly put out from the Montezuma to the Lehigh, bow and stern, and securely fastened.

Whether or not any ship was coming in requiring this shifting or whether Burgquist decided to quit work at the end of the day and wished to have the bargee of the Lehigh watch over his barge is immaterial for the reason that the motive for making this transfer becomes, in itself, unimportant. I believe the testimony of Burgquist, and Michelson, the bargee of the Lehigh, who apparently consented to this arrangement, that the Montezuma was tightly secured to the Lehigh by two new lines, bow and stern, the Montezuma being bow out towards the river and the Lehigh being bow in towards the bulkhead, which was about 100 feet away. The Montezuma was approximately 111 feet long and 32 feet wide. The Lehigh was 98 feet long and 30 feet wide.

Having thus tied up his barge to the Lehigh and about 7 p. m. Burgquist left his barge and went home. He came back the next morning about 6:45 and found that the Lehigh had gone away and that the Montezuma had drifted towards the shore and was lying between the two Piers 18 and 19 near the bulkhead hanging on one line, this was the stern line that Burgquist had put out. There was no bow line apparent anywhere, it had apparently disappeared. It may be mere speculation to guess where it had gone. There is, however, no evidence of any broken lines or indication of anything but that human hands that night had released the Montezuma from the Lehigh.

During the day of March 1, a northwest wind averaging 38 miles an hour had been blowing into this somewhat small slip. This wind decreased somewhat but, nevertheless, the record shows that during the early morning of March 2, it was blowing 22 miles an hour and it is a fair inference that it would kick up the water in the slip somewhat and have effect on a light boat such as the Montezuma unless she was securely tied.

The result of this stranding of the Montezuma when examined later on the morning of March 2, showed a twist of four or five feet but no damage to her bottom. This twist was later reduced, when subsequently examined, to about two feet.

At this point we will consider the explanation of the Pennsylvania and, as I have said, much of the mystery disappears. The Pennsylvania show that the Central tug came in during the early morning of March 2, in the dark and cold and somewhat heavy wind, to take out the Lehigh which was stern out towards the river and to which Burgquist had attached the Montezuma. That the crew of this Central let the Montezuma go loose at the mercy of the

wind which would drive her towards the bulkhead and towed the Lehigh out of the slip. In my opinion, that was what happened.

However, Captain Shine in charge of the Central tug and his three deckhands agree on the story, which, if believed, would show that when they entered the slip, they did not do so until 5:35 that morning. That the Montezuma was then already lying up against the bulkhead on top of the wreck of a small tug, which because of her length she could not possibly have done. Nevertheless, this loyalty to the captain which is not unusual in such cases produced this agreement between the captain and his crew. There are so many inconsistencies however in this effort to vindicate their tug that I find it impossible to believe it.

To mention but a few, Shine says, that he reported for work on the Central at 1 o'clock in the morning of March 2, his hours were from 1 to 9 a.m. He reported at Pier 17, North River, with his crew and received orders to go over to the slip between Piers 18 and 19 Brooklyn, and pick up the barge Lehigh. He states that it would take him about ten minutes on the ebb tide, which was the tide then flowing, to go from Pier 17 North River to the slip in Brooklyn. On flood tide it might take him fifteen minutes. Yet, he says, he did not arrive at Piers 18 and 19 until 5:35 a.m. He mentions this as the "exact" time. His deckhands agree. Just what he was doing during these hours between 1 and 5:35 has no explanation except the very doubtful statement that they were busy somewhere else in the North River in connection with some barges. Michelson, the bargee of the Lehigh, however, says the Central came in about two o'clock March 2nd.

Then Shine says that he came into this somewhat narrow slip, which is approximately 106 feet wide and took the barge on his side and backed her out. This recollection on his part possibly arises from the fact that he says he believes the slip was about 200 feet to 250 feet wide. Nevertheless, the Lehigh was 30 feet wide, the tug was 25 feet wide and at the end of the slip which he would have to pass was a B & O barge which probably at least was 30 feet wide, so that this kind of navigation, under the weather conditions, would hardly appeal to an experienced captain such as Shine was.

Captain Shine also testified: "I made fast to the Lehigh on my starboard side". This would be interesting when it is considered that the tug Central must have been about 100 feet long. The Lehigh alone was 36 feet wide and the slip 106 feet wide. I think in fairness to the captain he was probably thinking of the starboard side of the Lehigh. This mistake however, is, nevertheless, repeated by Hoffman, the deckhand of the Central, when he said: "We went right alongside the Lehigh and took her on our starboard side". Again Shine was mixed up on a report which he at first insisted was in his own hand writing but which was then shown to be in the handwriting of someone else.

Michelson, the bargee of the Lehigh, on whom I rely for the truth says, that the Lehigh was taken out by the Central on a line running from the bow of the tug to the stern of the Lehigh which would seem to be the sensible maneuver in view of the narrowness of the slip and the obstruction of the B & O barge at the end. After the Lehigh had been taken out of the slip the Central probably did take her on his starboard side.

However, Shine says that he did not tow the Lehigh by a bow line that "he never did such things". Yet, one of his deckhands, DeLuca, stated that he had seen Shine take other scows out on a head line on many occasions.

Finally, the agreed upon story of 5:35 a.m., exact time, and the startling sight of the Montezuma then lying at the bulkhead which Shine says so affected him when he put his search light on in the slip that he called his deckhands' attention to the sight should be noticed. Shine testified: "I always remark to the deckhands if anything comes up". Yet the fact is that the Montezuma which was then less than 100 feet away could not possibly have been lying up on the wreck as the latter was in a small slip beyond the main slip and the Montezuma was so long that she reached across the entire slip where she was found by Burgquist about seven o'clock. Captain Shine says that he went down a day or so

after the occurrence to look over the situation.

However, we have a rather interesting side light on this assurance that he saw the Montezuma which possibly shows an attitude of mind. He was asked what he did about it, when he saw the wreck? His answer in substance was, "I didn't know and I don't care because it was not my business. If we were to do a thing like that I would always be in trouble. If we see it and it don't belong to our company we don't bother with it. If it belongs to our company it is different that interests us and we have to take care of it". Yet I do not find even a report about it by Shine.

It is my considered opinion after listening to and seeing the witnesses that the testimony of the deckhands and the captain of the Central cannot be relied upon for the true facts, due possibly to an inability to remember accurately what took place, or to a desire to avoid liability for being plainly careless.

In my opinion, the credible evidence satisfies me that the Central came into the slip around the time testified to by the disinterested bargee on the Lehigh. He says that until the Central came in he felt from time to time the Montezuma alongside the Lehigh and that he heard the deckhands of the Central not only on the Montezuma, but on his own boat. That they put a line from the stern of the Lehigh to the bow of the Central and backed out of the slip.

Incidently the interesting disappearance of the new bow line then on the Montezuma whose bow was laying right alongside the stern of the Lehigh and which bow line was never seen again, might possibly be solved by an inference that in the dark of the night and the weather conditions, the bargee of the Lehigh being in his cabin, and no one on board of the Montezuma, the deckhands of the Central made temporary use of that line to so tow the barge Lehigh. However, it is unnecessary to do so.

■ There is no doubt in my mind that the deckhands of the Central in order to take out the Lehigh had to take off the lines of the Montezuma and that they then let her loose with the result that, with the wind,

she drifted towards the bulkhead and was damaged.

Libellant is therefore entitled to recover against the New York Central for the result of such negligence.

■ This brings us to the liability, if any, of the Pennsylvania. The Montezuma was orally chartered, in the usual way, and libellant's bargee, Burgquist, went with the barge. His services were paid for by libellant except as to overtime. To be sure he was to report to the Pennsylvania where the barge was, when she was light, and he did so. But he remained the agent and representative of libellant insofar as the care of the barge was concerned. The Junior, 2 Cir., 279 F. 407, 408. The Raymond M. White, D.C.E.D.N.Y., 290 F. 454–457.

Burgquist, and Michelson of the Lehigh, both testified that the Montezuma was tightly and securely tied to the Lehigh by new lines from the bow and stern of the Montezuma. The bow line was never found, the stern line was still on the Montezuma after she had drifted to the bulkhead. Michelson testified that he felt the Montezuma bumping against the Lehigh during the night.

If there was, but I see no reason to so find, any negligence on the part of Burgquist in the care of the barge such as walking her around and tying her up to the Lehigh the afternoon of March 1, or in leaving his barge unattended that night when he left about 7 o'clock, such neglect would be that attributable to libellant and not to the Pennsylvania.

■ To be sure the libellant in this case alleges in Paragraph Third of his libel, a promise on the part of the Pennsylvania to return the barge in the same condition as received, ordinary wear and tear excepted. The answer of the Pennsylvania, however, denies this latter promise and I have examined all the interrogatories and find nothing that would indicate that this arrangement between libellant and Pennsylvania was anything but the ordinary demise, made orally, and which has been frequently considered by the courts. As has been said "a covenant of this character should not be implied" and the case is one

of the usual bailment. The Monongahela, 9 Cir., 282 F. 17–20.

Accordingly, the liability, if any, of the Pennsylvania must be based on duly proven negligence. The E. T. Halloran, 2 Cir., 111 F.2d 571; Alpine Forwarding Co. v. Pennsylvania, 2 Cir., 60 F.2d 734; Tomkins Cove Stone Co. v. Bleakley, etc., 3 Cir., 40 F.2d 249.

Inasmuch as the Pennsylvania has duly explained why the barge was damaged there is no longer any inference in the case, but it remains a question of due proof by the libellant. Alpine Forwarding Co. v. Pennsylvania, supra. Libellant has failed to prove any such negligence on the part of the Pennsylvania.

I do not find that Burgquist was negligent in what he did but, in my opinion, even if he had been so considered to have been negligent in not taking due care of his barge or by leaving her, nevertheless, such negligence could not be attributed to the Pennsylvania.

Therefore libellant is entitled to recover against the New York Central and the libel against the Pennsylvania is dismissed.

Submit findings and decree.