DRAKE v. INLAND WATERWAYS
CORP. et al.
THE TUNIS et al.
No. 8878(2).

United States District Court
E. D. Missouri, E. D.
May 7, 1953.

Finley & Lucas, of St. Louis, Mo., for libelant.

George L. Robertson, U. S. Atty., of St. Louis, Mo., and James C. Jones, III, Asst. U. S. Atty., of St. Louis, Mo., for respondents.

HULEN, District Judge.

Libelant sues in admiralty [1] for loss of a wooden wharf barge and equipment on the barge, charging respondents with negligence in operating a towboat, so as to create an unusual swell, causing a gasoline

1. Which is the basis for Federal court jurisdiction.

barge to collide with the wharf barge to which it was moored. The collision resulted in damage to the wharf barge causing it to sink. The negligence charged is excessive speed. The issues are factual: (1) Were respondents negligent? (2) Was libelant's wharf barge seaworthy? (3) Was the steel barge properly moored to the wharf barge?

### Facts

Libelant owned a wooden wharf barge. On the night of August 10, 1951, it was moored at the foot of Market Street in the St. Louis Harbor of the Mississippi River. Libelant also owned a steel gasoline barge. It was moored on the river side, to the wooden barge. Respondent Steamer Tunis was proceeding downstream, with one barge in tow. As the Tunis passed the steel barge the swell made by the Tunis caused the steel barge of libelant to strike the wooden wharf barge, causing the timbers on the river side of the wooden barge to be caved in below the water line. The wooden barge sank.

Libelant testified he was sitting in the cabin on the steel barge, the night was dark, that he saw Tunis approaching and that its speed was 15 to 20 miles an hour. Witness Koch testified that he was in a bunk in a cabin cruiser moored some distance upstream and the swell from the Tunis rocked the cruiser so violently as to throw him out of the bunk; that he saw the Tunis moving away and estimated its speed at ten or twelve miles an hour. He attempted to follow the Tunis on the bank. Another witness testified that the swell from the Tunis caused steel landing plates on a landing barge to move up and down with some violence. The pilot of the Tunis testified that he was moving at reduced speed made necessary by the rope lashing with which the barge and tow were made fast. He put the speed of the Tunis at eight or nine miles an hour.

If respondents were operating their vessel at an excessive rate of speed—the only act of negligence charged—proof must be found in circumstantial evidence. There is no direct evidence of excessive speed. Libelant and the witness Koch saw the vessel in the dark. Weight of their testimony on speed is not substantial when compared with the testimony of the pilot of respondent boat. There is testimony that casts some doubt on whether libelant was telling the truth when he testified he saw respondent boat before the swell reached the barge he was on, having given a statement to the effect that he was in his bunk on the barge when the swell reached the barge. But whether the Court takes the rate of speed estimated by libelant of twenty miles an hour, or the rate given by the pilot of eight or nine miles an hour, there is no direct evidence on which the Court can find either speed was negligence for operating respondent boat under the circumstances shown. There is no substantial evidence that such speeds are of themselves negligent acts for operating a boat such as the Tunis, in the Mississippi River, in the channel of the St. Louis Harbor. There are no speed rules for the St. Louis Harbor. Respondent's pilot said it was his usual speed under the circumstances of the tow in the St. Louis Harbor. There is no evidence to the contrary.

We pass to the circumstantial evidence. The experience of Koch and another person on his boat being thrown from their beds and Koch going outside and seeing the Tunis pass, and trying to follow it on the bank, is evidence that an unusual swell struck the Koch cruiser. From that we are asked to presume it was due to the speed of the Tunis because the Tunis was passing. The landing plates on the steel barge were caused to rise and fall when the Tunis passed, and from this we are asked to presume it was due to the speed of the Tunis, because the Tunis was passing. Libelant's steel barge was thrown against the wooden landing barge causing the side of the wooden barge to "cave in." This happened at the time the Tunis was passing and we are asked to assume from this that the Tunis was proceeding at an excessive speed.

There is no evidence of any other source of the swell than respondent boat. Swells can be caused by speed. The presumption follows, the speed of respondent boat caused an unusual swell to strike libelant's barge.

## Legal Conclusions

The parties are in agreement that if libelant's wharf barge was seaworthy, and the steel gasoline barge properly moored to it, and the wharf barge sank as the result of an unusual swell from the respondent vessel in passing, the presumption is that respondents were at fault in operation of the Tunis at an excessive speed so as to cause an unusual swell. Damage to the wharf barge standing alone under the circumstances does not establish respondents' liability. Libelant has the burden of proof on the issue of seaworthiness and proper mooring.

Seaworthiness of the wooden wharf barge is a serious question in this case. Libelant had purchased the wooden barge three to five years before its sinking for $25. Libelant's explanation of the purchase price was that the owner was running up a watchman's bill. We are not convinced that was the reason. The barge was 80 feet long, 20 feet wide and 6 feet deep. Libelant claimed it had a salvage value for lumber of $500. If the timbers were not decayed and rotten it could have been salvaged for more than $25 when libelant purchased it. At the time of purchase libelant beached the barge for caulking the seams and also added some new timber to the deck. How old the barge was when purchased is not shown. The damage to the wooden barge that caused its sinking was not from a blunt or pointed object making a hole in the side, but water came in at the seams and the side was "caved" or "crushed" in. Libelant argues that because the wooden barge served its purpose for use as a wharf that that establishes seaworthiness. We cannot agree. It was while serving that purpose that it sank. If this barge was seaworthy libelant could and should have produced evidence of the condition of the side timbers. For a wooden barge there must come a time when it could not longer be considered seaworthy. The record leaves us in doubt as to whether the wooden barge was seaworthy at the time it sank. Libelant has failed to show by substantial evidence that the barge was seaworthy. On the record there is a serious question whether the advanced age of the barge and its unseaworthiness was the cause of its sinking. The evidence is that the swell caused the other vessels to move up and down. In the case of libelant's barge, we are called on to find the swell was of such force as to throw the steel barge against the wooden barge with such force as to crush the sides of the wooden barge. To find the swell was of such force and size as to result in such damage, in this way, to a seaworthy vessel, calls for gross speculation. There is no evidence whatsoever of the size of the swell that must have been spent substantially by the time it struck the shore.

Libelant testified as to how the steel barge was moored to the wooden barge, but whether the lines were a proper size, proper number, and properly placed, with proper slack to protect a barge under ordinary conditions, is a matter of speculation. Because the two barges had been moored together "about four years" the Court is asked to presume that they were properly moored.

Libelant's brief recites: "The swells created by the 'Tunis' were certainly not ordinary swells and their cause remains unexplained." Unless we indulge in a series of presumptions based on presumptions, many things "remain unexplained" which libelant had the burden of proof to establish. Because of the action of certain moored vessels including respondent's steel barge, when respondent's boat was passing, we are called on (1) to presume respondent's vessel caused an unusual swell; because libelant's steel barge had been moored to the wooden barge for several years without serious damage to the wooden barge, we are called on (2) to presume that the two barges were properly moored; and because the wooden barge had been in place as a wharf barge for several years, we are called on (3) to presume it was seaworthy. To find for libelant we must base presumption on presumption: that the wooden barge was seaworthy; and based on that presumption presume that it was properly moored; and based on that presumption presume that excess speed of respondent boat caused an unusual swell and caused the wooden barge to sink. The matters which we are called on to presume were matters susceptible of

proof, direct in some instances: Were the timbers of the wooden barge rotten or serviceable? Was the steel barge properly moored at the time of the sinking of the wooden barge? What were the sizes of the swells from respondent boat at the varying speeds of eight to twenty miles an hour? How much had the swells spent by the time they reached barges moored on the shore. While this is an admiralty case, libelant still has a burden. That is to establish his case by substantial testimony and by witnesses whose credibility is not weakened, such as the libelant's. It is our conclusion that libelant failed to carry the burden of proof.

### Damages.

■■■ The law is that owners of vessels seeking redress for damages based on negligence must be prepared to show not only fault on respondents' part, but that libelant is not guilty of negligence that increased or aggravated damages claimed. As to the equipment on the wooden barge, libelant admits as to part of it that it could have been salvaged. Faced with this admission we are presented with a confusing claim or theory of measure of damages. Attached to the libel as Exhibit A is a list of equipment. On the list appear two "Divers suits less helmets," and "2 pair hip rubber boots." At the beginning of the trial libelant announced claim for loss of these articles of $246 was withdrawn because the libelant "could have salvaged them" from the deckhouse on the barge. Other articles in the deckhouse were listed in the claim. No reasonable explanation is offered why, if libelant could have salvaged the divers suits and rubber boots hanging on the wall with reasonable effort, he could not have salvaged the balance of the equipment in the deckhouse. Libelant's Exhibit 3, a picture taken after the sinking of the barge, shows the shore side of the deckhouse barely under water and the river side not over two feet under water. Libelant's Exhibit 2 shows entrance to the deckhouse from the steel barge has been made after the barge was resting on the bottom of the river, near the bank. There were motors on the deck of the barge some distance from the deckhouse. They were eventually lost.

Libelant admits he should have salvaged these motors by presenting a claim based on overhaul cost, on assumption they were salvaged. Other property is subject of a claim on the assumption that it was washed overboard after the barge sank. We find the libelant was guilty of negligence which increased the damage resulting from the sinking of the barge. He has failed to carry the burden of proof on this issue. On the contrary the proof is both by libelant's admission and the testimony that most if not all of the equipment on the barge could have been salvaged by reasonable efforts on libelant's part. Only by resorting to guess and speculation can any distinction be made as to what equipment could be salvaged and what could not.

One explanation of failure of the libelant to use reasonable care to salvage the equipment is suggested by libelant's repeated assertion during the trial that the Government had paid him for losses in the past and would have paid him in this case had the claim gotten into the right hands.

We are not impressed that efforts to salvage property on the barge would have met with danger making salvage operations unreasonable.

We are not in agreement with libelant that he is entitled to overhaul expense on certain equipment on the theory that if such equipment had been salvaged it would have required an overhaul job. Libelant states the measure of damages in a case of this kind is the reasonable market value of the property just prior to loss. We agree. In case of salvage it would be the difference in reasonable market value before loss and after salvage. We know of no authority by which libelant can set up a hypothetical recovery on a hypothetical salvage and overhaul and recover on such a myth. To allow recovery on this basis would require an assumed salvage and based on such assumption, an assumed certain character of reconditioning to be necessary. The respondent is liable for actual damages only, not only for assumed or hypothetical damages.

The barge with deckhouse is a total loss to libelant. It could not have been salvaged. The evidence as to its value is of little

help to the Court. All we can do is use our best efforts in trying to arrive at value from the meager evidence offered. The barge cost $25. It had been caulked and some deck timbers replaced. A galvanized deckhouse had been installed "about the size of a garage." We think a value of $350 on the barge would be reasonable. The evidence is the value of ten boxes of welding rods were destroyed when they were submerged and would have had no salvage value. They were in the deckhouse. Their value is put at $62.50.

Although the libel will be dismissed for the reasons above set out, our memorandum covers all the issues.