Arnold **MULZER**, Roland Mulzer and Edgar Mulzer, Partners, etc., Plaintiffs-Appellees (Cross-Appellants),

v.

**J. A. JONES CONSTRUCTION COMPANY**, Defendant-Appellant (Cross-Appellee).

**Nos. 16514, 16515.**

United States Court of Appeals Seventh Circuit.

June 26, 1968.

Fred P. Bamberger, Evansville, Ind., Bamberger, Foreman, Oswald & Hahn, Evansville, Ind., of counsel, for defendant-appellant (cross-appellee).

Joseph V. McGovern, Stuart B. Bradley, Chicago, Ill., Bradley, Eaton, Jackman & McGovern, Chicago, Ill., of counsel, for plaintiffs-appellees and cross-appellants.

Before CASTLE, Chief Judge, and FAIRCHILD and CUMMINGS, Circuit Judges.

CASTLE, Chief Judge.

Plaintiffs-appellees, a partnership consisting of Arnold, Roland and Edgar Mulzer, the owner of Barge No. 376, brought this admiralty action in the District Court for damages sustained to the barge and for the loss of its cargo which occurred when the barge capsized while moored to the cofferdam at a construction site where defendant-appellant, J. A. Jones Construction Company, was building a lock and dam on the Ohio River near Cannelton, Indiana. The action was tried before the court on plaintiffs' amended complaint which alleged that the defendant as bailee negligently caused the capsizing of the barge, and on defendant's answer which denied any negligence on its part and asserted that plaintiffs furnished an unseaworthy barge which was the sole cause of the capsizing and resulting damage and loss.

The District Court made and entered detailed findings of fact and conclusions of law on the basis of which it entered judgment dividing the damages equally between the parties. Both parties appealed. The defendant, J. A. Jones Construction Company, prosecutes appeal No. 16514, and the plaintiffs, Mulzer Bros., prosecute the cross-appeal No. 16515.

The record discloses that plaintiffs were engaged in the business of selling aggregate stone from quarries located along the river in the vicinity of Tell City, Indiana. The plaintiffs had contracted with the defendant to furnish and deliver crushed limestone at the job site in plaintiffs' barges for use by the defendant. Pursuant to a purchase order issued by the defendant under such contract the plaintiffs delivered to the defendant at 3:30 p.m. on Friday, September 3, 1965, its deck barge No. 376 loaded with 1260 tons of crushed rock. In keeping with the custom of prior deliveries to defendant, personnel of the towing company engaged by the plaintiffs effected the mooring and tied off the barge at the cofferdam by the use of the mooring cables supplied by the defendant and lashed the bow of the plaintiffs' barge to the stern of another barge moored upstream. The next day was the commencement of the Labor Day holiday week-end during which the defendant was not engaged in construction operations. But the defendant maintained one employee at the job-site on each of three daily shifts. The employee on duty in the morning of Sunday, September 5, 1965, Charles Rogier, noticed at about 5:00 a. m. that the barge was listing at the port bow toward the cofferdam. He continued on his routine duties of checking the pumps at defendant's project which consumed approximately forty-five minutes and then returned to look at the barge. The list had increased in the interim. The defendant's construction office was locked so he was unable to use the telephone. He went to the Cannelton home of the construction superintendent and notified him of

the condition of the barge. The superintendent, W. E. Haynes, and Rogier arrived back at the job-site at about 6:20 a. m., where they were met by the day-shift employee, Earl Griffin, who had arrived for work a little early. Rogier loosened, at the top of the cofferdam, the upstream cables which were tied to the port bow of the barge. There were other mooring cables attached to the midsection and port stern of the barge. The three men went out on the river in the defendant's motor boat, and boarded the barge. They found no water in the main compartments, but on opening the hatch on the starboard side of the bow rake compartment that compartment was found to contain water up to within a foot or eighteen inches below the hatch. The bow rake compartment had sufficient capacity to hold forty thousand two hundred gallons of water. The men returned to the top of the cofferdam where they obtained a four-inch pump which they lowered by crane to the barge adjacent to plaintiffs' barge. It was necessary to install a new set of spark plugs to get the gasoline motor of the pump started. The pump had a capacity of approximately 650 gallons per minute. After the pump hose was inserted into the bow rake compartment of the barge, and the pump had been operated for a period estimated by various of the three men to be from five to fifteen minutes, the barge capsized, the starboard deck and side overturning and striking the cofferdam. The cargo was lost and the barge was substantially damaged.

The court found that prior to its delivery to the defendant the plaintiffs' barge had a one eighth by three inch puncture type hole in the port side of the forward rake compartment, four feet below the deck level, or three feet below the water line with the load the barge was carrying, or three feet and four inches above the water line before loading; that this hole was the cause of the water filled forward compartment; and

that the hole rendered the barge unseaworthy. The court found that neither the plaintiffs nor the defendant were apprised of the small hole at any time until after the capsizing of the barge; and that some damage or loss would have occurred even if the barge had not capsized either caused by the barge's sinking or the expense involved in preventing such sinking.

But the court also found:

"The defendant's conduct was contrary to the conduct of a prudent bailee exercising ordinary care under the same or like circumstances in that it failed to maintain watchman services to timely discover the leaking condition of the barge by timely observing its port side bow list and failed to timely pump the water from the forward compartment of the barge. The defendant's conduct contributed to cause the capsizing of the barge, side over side, and the resulting damage."

And, that with qualified watchman service on the part of the defendant to look, think, and act, that is to look for apparent or threatened danger and once discovering it, to think how to avoid or meet the danger, and to act to avoid or meet its effect, the side-over-side capsizing of the barge and resulting damage could have been avoided.

It is on the ultimate factual findings both as above summarized and above quoted, and a number of more detailed subsidiary factual findings upon which they rest, that the court concluded that "continuing concurrent negligence of the parties as so found proximately caused the incident" and the damages [1] resulting therefrom, and awarded the judgment equally dividing the damages between the parties. And from our review of the record we find no basis for concluding that any of the critical factual findings of the District Court are clearly erroneous. There is substantial evidence to support them, and we are left with no definite or firm conviction

1. Except for the cost of repairing the pre-existing hole, and such salvage costs as would have been otherwise required but for the capsizing.

that a mistake has been committed. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746.

The unseaworthiness of the barge is based, of course, upon the existence of the hole in the port side of the bow rake compartment. And, under the circumstances here involved, the plaintiffs, as owners of the barge, had the burden of proving that they delivered the barge to the defendant in a seaworthy condition. Commercial Molasses Corp. v. New York Tank Barge Corp., 314 U.S. 104, 62 S.Ct. 156, 86 L.Ed 89. Insofar as plaintiffs' evidence of seaworthiness rests on a pre-loading examination of the barge it establishes only a cursory examination of the barge by plaintiffs' supervisor Malone on September 1, 1965, prior to its loading. He did not remove the hatch covers, nor was his inspection conducted from a vantage point from which he could have seen the small puncture type hole, if it were there at the time. And, his testimony that the barge after loading on September 1, 1965, was sitting level in the water without list, and the testimony of the tow boat pilot that the barge was on even keel during the tow on September 3, 1965, is not inconsistent with the existence of the hole prior to the barge's delivery to the defendant. There is testimony by defendant's witness Haynes, a professional engineer, that water would flow through the size aperture described in the evidence as located three feet below the water line at the rate of 37.5 cubic feet per hour, and the bow rake compartment contained approximately 5,360 cubic feet of space.

Plaintiffs argue that the puncture occurred while the barge was in the defendant's custody as bailee through contact with one of several four inch by four inch metal sheets which witness Rogier testified had been welded to the riverward side of the cofferdam, at approximately three feet above the pool stage of the river, for the purpose of mooring welding barges from which welders worked in patching the sheet metal piling of the cofferdam. In this connection there was testimony that the river was 7.7 feet above pool stage when the barge was moored on Septembeer 3, 1965. But this does not serve to demonstrate the existencee of clear error in the court's finding that the puncture existed before the barge was delivered to the defendant. Although Rogier stated that not all of these mooring devices were removed when the welding operation was completed, he was unable to state where they had been located— nor did he testify that any of the devices had been affixed to the cofferdam in the area where plaintiffs' barge was moored. Both Haynes and Griffin testified that they observed no such metal protrusions in the area where the barge was moored. And the river stage was such on September 5, 1965, that such devices would have been observable had they been there.

We conclude on this phase of the case that the court's finding that the plaintiffs delivered an unseaworthy barge is not clearly erroneous. We turn to consideration of the court's findings with respect to the existence of concurrent negligence on the part of the defendant.

In addition to the findings we have heretofore quoted the court made subsidiary findings that the primary duties of the one man maintained on the job-site during each of the shifts over the week-end holiday were those of maintaining air compressors and pumps in construction sites, the floating craft of the defendant, checking mooring lines of supplier's barges, and keeping spectators away from the job-site; that the night pumper, Rogier, the least experienced, performed no watchman duties and had no duties pertaining to the barges of suppliers in the custody of the defendant moored to the cofferdam; that the day pumper made a round by motor boat about 3:30 p.m. for the purpose of servicing the defendant's own barges which had to be pumped at regular intervals so that the evening and night shift pumpers would not be required to go out on the

river at night; and that in making such round on September 4, 1965, the day pumper passed on the riverside of a barge to the starboard side of the plaintiffs' barge, observed the mooring lines of the latter, but nothing attracted his attention to any listing of the plaintiffs' barge.

These findings are supported by the testimony of both Griffin, the day pumper, and Rogier, the night pumper.[2] Although Griffin testified that on weekends "we are more or less watchmen" he stated with respect to his passing the plaintiffs' barge on Saturday, September 4, 1965:

" * * * I just passed by in a little motor boat and just glanced at it to see that the lines were tied at both ends. * * *

\* \* \* \* \* \*

If it had been listing a very little bit I wouldn't pay any attention to it; lots of times there is a little list in them, but unless it's something unusual I wouldn't have stopped and inspected it. I only glanced at the lines and see if they were fastened at both ends."

Rogier testified that he had no other duties except inspecting and maintaining the pumps used to keep seepage out of the inside area of the cofferdam; that he had no duties with respect to watching the barges; that he knew of no watchman employed by the defendant; and that he had no duties with respect to barges moored to the cofferdam. Defendant's construction superintendent, Haynes, testified that the defendant employed no "watchman there as such".

And, there is no testimony with respect to any definite or particular in-

structions the defendant had given the pumpers concerning the surveillance or care to be given the barges of suppliers moored at the cofferdam. The day pumpers did check the defendant's own barges for leakage by opening the hatches, making an inspection, and pumping the barge if needed. A pump was kept on the motor boat for this purpose in case the barge was not equipped with one.

On the basis of the record before us we conclude that the court's factual findings upon which it premised the conclusion that defendant was negligent[3] are not clearly erroneous.

The judgment order of the District Court is therefore affirmed.

Affirmed.

---

**2.** The third employee, a pumper who worked the 4 p. m. to 12 a. m. shift, was not available as a witness. He was incapacitated as the result of an automobile collision in which he sustained a brain injury.

**3.** Insofar as any of the findings of the District Court indicate that defendant was negligent in not untying the barge when the forward compartment was dis-

covered to be filled with water so that if the pumping operation failed the barge would sink without capsizing against the cofferdam and be damaged thereby, we do not predicate affirmance as to the defendant's appeal on that basis. Cf. Richmond Sand & Gravel Corporation v. Tidewater Const. Corporation, 4 Cir., 170 F. 2d 392, 395; The S.S. Bellatrix, 3 Cir., 114 F.2d 1004, 1007.