The OHIO RIVER COMPANY, Plaintiff,

v.

CONTINENTAL GRAIN COMPANY, Defendant, Third Party Plaintiff,

v.

OIL TRANSPORT COMPANY, INC., American Commercial Barge Lines, Inc., the M/V CHICAGO TRADER and the M/V BAYOU LA REINE, Third Party Defendants.

AMERICAN COMMERCIAL BARGE LINES, INC., Cross-Plaintiff Cross-Defendant,

v.

OIL TRANSPORT COMPANY, INC., Cross-Defendant Cross-Plaintiff.

CONTINENTAL NAVIGATION COMPANY, Plaintiff,

v.

OIL TRANSPORT COMPANY, INC., et al., Defendants.

AMERICAN COMMERCIAL BARGE LINES, INC. owner of the M/V Chicago Trader, Cross-Plaintiff,

v.

OIL TRANSPORT COMPANY, INC., owner of the M/V Bayou La Reine, Cross-Defendant.

OIL TRANSPORT COMPANY, INC., Cross-Plaintiff,

v.

AMERICAN COMMERCIAL BARGE LINES, INC., Cross-Defendant.

Nos. 69 C 1420, 69 C 2294.

United States District Court, N. D. Illinois.

Dec. 19, 1972.

William K. Johnson, Lord, Bissell & Brook, Chicago, Ill., for Continental Navigation Co., plaintiff.

Heineke, Schrader, Marsch & Cuncannan, Chicago, Ill., for Oil Transport Co., Inc., defendant, cross-defendant and cross-plaintiff.

Michael A. Snyder, Bradley, Eaton, Jackman & McGovern, Chicago, Ill., for American Commercial Barge Lines, Inc., defendant, cross-plaintiff, and cross-defendant.

McCreary, Ray & Robinson, Chicago, Ill., for plaintiff The Ohio River Co.

Lord, Bissell & Brook, Chicago, Ill., for Continental Grain Co., defendant and third party plaintiff.

### MEMORANDUM OPINION AND DECREE

EDWIN A. ROBSON, Chief Judge.

The Ohio River Company (Ohio River) and the Continental Navigation Company seek to recover in these suits in admiralty damages to their barges, OR-55 and CNC-195B, respectively. Oil Transport Company, Inc. (Oil Transport) and its towboat, the M/V Bayou La Reine, and American Commercial Barge Lines, Inc. and its towboat, the M/V Chicago Trader, were impleaded as third-party defendants in 69 C 2294. The jurisdiction of this court pursuant to 28 U.S.C. § 1333(1) is apparent from the pleadings and is undisputed.

This court is of the opinion that both Continental Grain Company (Continental) and Oil Transport were at fault and are liable for the damages to the barges. This court is also of the opinion that the complaints against American Commercial Barge Lines, Inc. must be dismissed with costs taxed to the plaintiff and to the third-party plaintiff.

## FINDINGS OF FACT

There is general agreement among the parties as to the events which form the base of this litigation although there is considerable dispute as to their causes. On February 2, 1968, the Bayou La Reine and the Chicago Trader were pushing their tows in an upbound direction (towards Chicago) in the Sanitary and Ship Canal. At about 4:30 p.m. both ships passed through the then existing 9th Street Bridge located at mile point 292.7 on the canal. The elevator and facilities owned by Continental are located just above the bridge on the west (left ascending) bank. At mile point 293 above the Continental facilities the canal is divided into two channels by a butterfly dam.

Both tows were proceeding against a strong current caused by the heavy discharge of water at the Lockport Dam at mile point 291, and the water level in the two miles of the canal above the dam was below normal. The Chicago Trader proceeded close alongside the east (right ascending) bank at a speed of less than one-half mile per hour and prior to 5:00 p.m. entered the east draw of the butterfly dam. At about 4:35 p.m., the Bayou La Reine had signalled her intention to overtake and pass the Chicago Trader, which had assented to the maneuver. While the Chicago Trader was in the east draw of the butterfly dam, the tow of the Bayou La Reine went aground in the west draw of the dam. The Bayou La Reine worked her engines in reverse for some time at full power in order to free her tow. While both tows were in the dam, three barges moored at the Continental elevator broke loose from their moorings, drifted out into the canal, and eventually struck the center pier of the bridge. The barges then separated. Barges OR-55 and CNC 195-B drifted under the bridge and were damaged.

The evidence regarding the first element of the libellants' case, that the swells and suction created by the passing vessels caused the barges to break away from their moorings, is somewhat conflicting. Both the bridgetender and the manager of Continental observed the water directly behind the towboats churning severely and the resulting turbulence flowing downstream from the vessels past the dock area toward the bridge. The manager also noticed that all six lines connecting the barges to the shore fixtures had snapped. There was expert opinion testimony that under the circumstances the wheel wash from the vessels would have some effect upon the barges moored at Continental. And there is no dispute that the water level in the canal was extremely low at the time of the breakaway, thus causing the current to be stronger than usual.

Conversely, employees of the Bayou La Reine testified that they did not observe any wheel wash from the towboat during the time that it was working its engines astern and that the wheel wash would emerge in front of the vessel, but their testimony was qualified. There was also expert testimony that a vessel moving forward through the butterfly dam would throw its wheel wash against the opposite wall of the canal from the Continental docks and that the cause of the accident was the recurrent changes in water level and the "traffic back and forth all day long" which caused the barge lines to finally wear and break.

This court concludes that the turbulence created in the canal by the passing vessels caused the barges moored at the Continental facility to break away and to be damaged. There is credible evidence that turbulence was indeed created at the Continental docks and expert testimony that such turbulence could affect barges moored there. In view of the narrow waters involved and the unusual conditions (low water and one vessel aground and straining to free herself) at the time of the accident, the evidence that the vessels could not or did not create sufficient turbulence to cause barges moored at the Continental facility to break free is unpersuasive. Furthermore, the suggested alternative causes of the mishap, variations in water level and the cumulative effect of canal traffic, are not directly supported by any ev-

idence and are unlikely considering the routine precautions of Continental.

The second element of libellant's case is whether the barges were moored so as to resist ordinary turbulence which should normally be anticipated. The practice followed when mooring barges on the canal is for the towboat leaving an empty barge at an elevator to moor the barge with two lines. Continental's practice is to check the lines on all barges, loaded or empty, both in the morning and the evening. Lines which have a strand broken are replaced, and lines which have worked loose are tightened. Sometimes lines left to secure an empty barge are inadequate for use upon a loaded barge and are replaced with Continental's own lines. The manager of Continental made his usual inspections on the day before the breakaway and on the day of the accident itself, walking on the barges and inspecting all six lines each time. All the lines were in good condition. The water level in the canal did fluctuate somewhat during the previous night, but it remained relatively constant and dropped less than one foot during the working day preceding the accident. The records of the bridgetender show that fifteen other vessels passed through this portion of the canal under these relatively constant conditions on the day of the accident without causing any undue disturbance. Under these circumstances this court is of the opinion that the barges were moored in the usual and customary manner employed by Continental and were moored in a manner calculated to resist ordinary and normal swells which might reasonably be anticipated.

Furthermore, the court is of the opinion that the inspection of the mooring of the barges at reasonable intervals by Continental met the requirement of properly watching over the barges "to look, think, and act, that is to look for apparent or threatened danger and once discovering it, to think how to avoid or meet the danger, and to act to avoid or meet its effect." Mulzer v. J. A. Jones Construction Co., 397 F.2d 498, 500 (7 Cir. 1968). In *Mulzer* the danger to a barge was allowed to develop slowly over a long weekend and could have been discovered by periodic inspections. The lack of such care, not the failure to post a lookout who would watch over the barge continuously, constituted the negligent act of the bailee in *Mulzer*.

However, the fact that the barges were moored in a manner calculated to resist swells and turbulence normally to be anticipated does not mean that they could not have been better secured to meet the somewhat unusual conditions which occurred on the day of the accident. There was expert testimony that the three barges at the Continental docks could have been better moored in three respects: a breast line could have been used as well as the two end lines which were actually used, all three barges could have been each moored directly to the shore instead of two barges being moored abreast, and lead lines could have been used on each barge.

The Continental elevator has three cells located in the canal to which barges may be moored and a sunken barge immediately to the north of the cells which is also used for mooring. On the day of the accident the barge RBL-115 was moored between the center and the south cells. The barge CNC-195B was touching the RBL-115 and was tied to the sunken barge. The barge OR-55 was parallel to and tied to the CNC-195B. Although no barges were being loaded that day due to low water, Continental moored the barges in this manner in order that the OR-55 could be passed downstream underneath the grainspout without disturbing the other barges.

Given the relatively exposed positions in which the barges were tied, Continental should have taken all reasonable precautions to see that they were moored securely. Such precautions would have included the use of breast and lead lines. A breast line is a line tied from the center of a moored ship to the shore while a lead line is a line tied from the bow or the stern of a moored

ship to a point either ahead of or behind it in order to prevent surges in either direction. A breast line from the CNC-195B to the sunken barge would have helped prevent that barge from swinging out into the canal due to the leverage from the current against it and against the OR-55 tied to it. Similarly, a lead line from the RBL-115 to a point on the sunken barge would have reduced the leverage of the current against that barge. Other lines apparently could not be used because of a lack of mooring points on the shore. The two mentioned were not used because there were only two mooring points on the sunken barge, one at each end. However, adding mooring points to the sunken barge already in position at its docks, or even adding mooring points to the shore, would not have been a large burden for Continental and would have added to the security of the barges which it chose to moor as it did. Not doing so constitutes fault which combined with the abnormal swells to cause the damage to the barges.

Thus, in a closely analogous case Judge Learned Hand recognized that

" . . . there are occasions when every vessel will break from her moorings, . . .; the owner's duty, as in other similar situations, to provide against resulting injuries is a function of three variables: (1) The probability that she will break away; (2) the gravity of the resulting injury, if she does; (3) the burden of adequate precautions." United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir. 1947).

The gravity of the injury which would be caused by a breakaway of barges moored in the canal was great even when discounted by the small likelihood of its occurring and outweighed the apparently small burden of adding mooring points to a shore facility already in place, or of creating new mooring points. See W. Prosser, Handbook of the Law of Torts 148–49 (4th ed. 1971). The failure of Continental to provide adequate facilities was thus a directly contributing cause of the damage to the barges, and the rule of divided damages applies. See Williamson v. The Carolina, 158 F. Supp. 417 (E.D.N.C.1958).

Under these circumstances, there is no need to decide whether the inconvenience and expense to Continental of mooring each barge directly to the shore justified the placing the barges two abreast so that the third barge might be easily loaded. Neither is a decision required on whether the various acts on the part of the vessels alleged to be statutory fault create a liability to Continental in that such liability is raised by its proof of causation and proof of mooring sufficient to meet ordinary turbulence.

The question than arises whether both vessels are liable for creation of the turbulence which caused the barges to break away. This court is persuaded that the actions of Chicago Trader were not a contributing cause of the mishap. Its captain, as might be expected, testified that there was no unusual wheel wash created by his vessel as it passed the Continental elevator and the butterfly dam. But in addition, the pilot of the Bayou La Reine testified unequivocally that his vessel and its tow were at all material times between the stern of the Chicago Trader and the Continental, and that the wheel wash from the latter vessel created no difficulty in controlling his tow. Continental's expert witness testified that unless a port rudder were used, the wheel wash of a vessel such as the Chicago Trader would flow directly to the rear of the propeller, while the expert witness of the Chicago Trader testified that the usual and customary pattern of navigation through this portion of the canal would involve no use of a port rudder but instead the use of a starboard rudder which would throw the wheel wash of the vessel against the opposite wall of the canal from the Continental elevator. There is no evidence which would rebut the obvious inference that the Chicago Trader was not responsible for creating the turbulence which caused the barges to break away from their moorings other

than the general testimony that both vessels were churning the water severely. A conclusion that any turbulence created by the Chicago Trader must have had some effect upon the barges would be speculative and unsupported by the record. This court is therefore of the opinion that the complaints against American Barge Lines, Inc., the owners of the Chicago Trader, must be dismissed.

## CONCLUSIONS OF LAW

Clearly, each swell damage case rests upon it own special facts. Western Oil & Fuel Terminal Co. v. The Elisha Woods, 89 F.Supp. 862 (W.D.Ky.1950); Martin Marine Transportation Co. v. United States, 66 F.Supp. 673 (E.D.Pa. 1946). In some cases the conduct of the damaged vessel was apparently not challenged or not proven to be at fault. E. g., West India Fruit & S.S. Co. v. Raymond, 190 F.2d 673, 674 (5th Cir. 1951), ("a good staunch offshore fishing boat . . . moored in a seamanlike manner"); Ladd v. United States, 97 F. Supp. 80 (E.D.Va.1951) (vessel not unseaworthy or at least not proven to have been so). But in other cases the evidence of unseaworthiness, Drake v. Inland Waterways Corp., 111 F.Supp. 891 (E.D.Mo.1953), or of improper mooring, Martin Marine Transportation Co. v. United States, *supra*, was particularly strong.

The rules of law involving swell damages have been summarized as follows:

"A ship passing piers or docks where other vessels are tied up is obligated to proceed carefully and prudently so as to avoid creating unusual swells or suction which would damage craft properly moored or installations along the shoreline . . . . [Citations]. The moving vessel must take into consideration the reasonable effects to be anticipated from its speed and motion through the water and must take such precautions by way of reduction of speed or alteration of course as may be reasonably necessary to prevent such damage. . . . [Citations].

"On the other hand piers and docks along the shoreline are required to be kept in proper condition and vessels tied up there must be seaworthy and properly moored so as to resist ordinary and normals swells in narrow waters where heavy traffic may be anticipated. Some wash from passing vessels is bound to occur and must be anticipated and guarded against. Only unusual swells or suction which cannot be reasonably anticipated furnish the basis for a claim . . . [Citations].

"Once libelant has established that swells or suction caused damage to its craft tied up at the shoreline, that such craft were properly moored to resist ordinary swell and suction normally to be anticipated, and that the swells came from the passing vessel charged with liability, the vessel which caused the swell is then required to exonerate itself from blame. In order to avoid liability she must show that it was not in her power to prevent the injury by any practical precautions she could have adopted." O'Donnell Transportation Co. v. M/V Maryland Trader, 228 F.Supp. 903, 909 (S.D.N.Y.1963).

■ On the issue of the liability of the Chicago Trader, even if the evidence would justify a finding that it contributed to the turbulence that caused the barges to breakaway, the risk of damage to shore facilities should be borne by the vessel which chooses to pass and thereby allows its wake and wheel wash to interact with that of the vessel being passed. Although no case apparently has decided precisely this point, ". . . it is well established that the duty to avoid the effects of suction between two passing vessels is placed upon the overtaking vessel . . . ." Union Oil Company of California v. Tug Mary Malloy, 414 F.2d 669, 672 (5th Cir. 1969) and cases there cited; American Trading & Pro-

duction Corp. v. T. J. Stevenson & Co., 113 F.Supp. 332 (S.D.N.Y.1953).

■ Even though this court is persuaded that its actions were not a cause of the accident, if the Chicago Trader was guilty of statutory fault, it must prove not only that it did not contribute but also that it could not have contributed to the accident in accordance with the rule of The Pennsylvania, 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874).

The statutory fault urged against the Chicago Trader is that it assented to the proposal of the Bayou La Reine to pass at the butterfly dam in violation of the appropriate Western River Rule 22(b) (33 U.S.C. § 347(b)) instead of replying with the danger signal. Vessels have been found to be guilty of statutory fault for giving an assenting signal or no signal at all while knowing that passing would be unsafe. M. P. Howlett, Inc. v. Charles Warner Co., 58 F.2d 923 (3rd Cir. 1932); Westfal-Larsen & Co. v. Baltimore & Carolina Line, Inc., 50 F.2d 724 (4th Cir. 1931); The Edward Smith, 135 F. 32 (6th Cir. 1905).

On the other hand, the reply to a passing signal has been characterized as "no more than an assent to it, at the risk of the vessel proposing it . . . [which] expressed an understanding of what the . . . [passing ship] proposed to do, and an agreement not to thwart it" which leaves the success of the maneuver at the risk of the passing ship. Atlas Transportation Co. v. Lee Line Steamers, 235 F. 492, 495 (8th Cir. 1916). The Atlas case was cited with approval on this issue in Southern Pacific Co. v. Haglund, 277 U.S. 304, 48 S. Ct. 510, 72 L.Ed. 892 (1928) and quoted with approval in Charles Warner Co. v. Independent Pier Co., 278 U.S. 85, 49 S. Ct. 45, 73 L.Ed. 195 (1928).

■ One possible reconciliation of these cases is that the assenting ship is guilty of fault if it fails to warn the overtaking ship of danger of which the latter is unaware. See B. F. Diamond v. M/V Fernside, 252 F.2d 381, 382 (5th Cir. 1958) ("[I]t is sufficient to say that . . . [the evidence] establishes beyond dispute that there was nothing to prevent the Fernside from seeing and knowing all of the conditions and circumstances surrounding and attending her decision and her attempt to pass.") But see Westfal-Larsen & Co. v. Baltimore & Carolina Line, Inc., supra, 50 F.2d at 726–727. If such is the law, then the Chicago Trader could not be guilty of statutory fault since the Bayou La Reine had precisely the same knowledge of the barges and water conditions which would have alerted it to the possibility of dangerous swells and turbulence being created. Even if the Chicago Trader were required to refuse to allow the Bayou La Reine to pass if in its own opinion so doing was dangerous under the circumstances, there was still no statutory fault inasmuch as it was entitled to assume that the Bayou La Reine would not run aground and thus run her engines full in reverse for some time in order to free herself. See Pan American Petroleum & Transport Co. v. The Steelore, 220 F.2d 688 (4th Cir. 1955); Charles Warner Co. v. Independent Pier Co., supra; Southern Pacific Co. v. Haglund, supra; Atlas Transportation Co. v. Lee Line Steamers, 238 F. 349 (8th Cir. 1916) (on petition for rehearing). Although there were differences in the testimony as to the navigability of the east draw of the butterfly dam, the Bayou La Reine must be deemed to know the depth needed for her own tows and to be responsible for avoiding grounding. The Chicago Trader was entitled to assume that such due care would be exercised which would avoid the events which occurred. There was no inherent or obvious danger. Under these circumstances assenting to the passing maneuver cannot constitute fault.

■ Although these findings and conclusions settle the issues of causation and fault, there remains the issue of whether, as stated by counsel for Oil Transport, "the [original] plaintiff could be entitled to a judgment against the third-party defendants even though

it asserted no claim and offered no evidence against them." The plaintiff, Ohio River, relies upon Rule 14(c), F.R. Civ.P., which provides that when a third party is impleaded in an admiralty suit,

". . . the third-party plaintiff may also demand judgment against the third-party defendant in favor of the plaintiff, in which event the third-party defendant shall make his defenses to the claim of the plaintiff as well as to that of the third-party plaintiff . . . and the action shall proceed as if the plaintiff had commenced it against the third-party defendant as well as the third-party plaintiff."

But Oil Transport asserts that the rule merely permits the defendant to "insist that the plaintiff proceed to judgment against the third-party defendant" and relies upon the note of the Advisory Committee for this proposition.

The Ohio River introduced a stipulation with Continental that its barge had been delivered in a seaworthy condition to the latter and had been returned damaged. Ohio River then rested. Continental and the third-party defendants then introduced the testimony upon which the previously discussed findings and rulings are based. The question, therefore, is whether Ohio River is entitled to the benefit of this evidence.

Neither party has cited a case which passes directly upon this issue, and this court has not discovered one. However, there are cases in which a decree in favor of the plaintiff against the third-party defendant appears to be based upon evidence introduced by the original defendant. For instance, in McAllister Lighterage Line, Inc. v. Pennsylvania Railroad Co., 66 F.Supp. 562 (E.D.N.Y. 1946), the plaintiff failed to prove negligence on the part of the Pennsylvania which had chartered the damaged barge because the latter explained the damage to the barge and showed that the New York Central was at fault. "Therefore libellant is entitled to recover against the New York Central . . . ." *Id.* at 566.

■ Furthermore, this court is of the opinion that application of Rule 14(c) in this manner is the only possible interpretation of it which would be consistent with its purpose and intent. In the first place, there can be no doubt that if a judgment were to be executed against Continental Grain Company, the Bayou La Reine could be required to contribute to its satisfaction. Although contribution is not proper in a noncollision admiralty case, Atlantic Coast Line Railroad Co. v. Erie Lackawanna Railroad Co., 406 U.S. 340, 92 S.Ct. 1550, 32 L.Ed.2d 110 (1972), the right to contribution has long been held to be incident to the joint liability and the shared damages in an admiralty claim based upon a collision. Erie Railroad Co. v. Erie and Western Transportation Co., 204 U.S. 220, 27 S. Ct. 246, 51 L.Ed. 450 (1907); *see* Mendez v. States Marine Lines, Inc., 421 F. 2d 851 (3rd Cir. 1970). And ". . . although the usual collision case involves immediate physical impact—indeed, that is what collision is, in the strictest sense—nevertheless liability as for collision may sometimes be incurred where the wrongdoing and the victim vessels never actually touch one another." G. Gilmore and C. Black, The Law of Admiralty (1957) at 407.

And, if contribution is proper, the very purpose of third party practice is to avoid duplication of litigation in such situations. 3 Moore's Federal Practice ¶ 14.04 at 501. If the contention of Oil Transport were correct, either a separate suit for contribution or repetitious pleadings and testimony on the part of the plaintiff and the third-party plaintiff would be necessary in the original trial. Such cannot be the meaning of Rule 14(c). The rule provides instead that the third-party plaintiff may demand judgment against the third-party defendant *in favor of the plaintiff* and shall be construed as meaning precisely that. Ohio River is thus entitled to re-

cover its damages from both Continental and the Bayou La Reine.

This opinion shall constitute findings of fact and conclusions of law as required by Rule 52(a). The parties are ordered to submit a decree accordingly.